Kenneth J. HAMMOND et al., Plaintiffs,

v.

Paul W. BROWN, Individually and as the Attorney General of Ohio, et al., Defendants.

Raymond J. ADAMEK et al., Plaintiffs,

v.

Paul W. BROWN, Individually and as the Attorney General of Ohio, et al., Defendants.

Civ. A. Nos. C 70–998, C 70–1039.

United States District Court,
N. D. Ohio, E. D.

Jan. 28, 1971.

Gerald A. Messerman, Benjamin B. Sheerer, Jerry Gordon, Cleveland, Ohio, David Scribner, New York City, for plaintiffs.

Robert D. Macklin, Columbus, Ohio, Robert L. Balyeat, Sp. Counsel, Lima, Ohio, Perry G. Dickinson, Seabury H. Ford, Ravenna, Ohio, for defendants.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

Each of these actions seeks declaratory and injunctive relief, and each is founded on 42 U.S.C. § 1983 (1964) (deprivation of civil rights). Consolidated for trial each action requests a permanent injunction to bar the prosecution of the 25 persons secretly indicted on October 16, 1970, by a Special Grand Jury of Portage County (Ohio) Common Pleas Court, in 30 true bills of indictment covering 43 offenses. Also requested is an order to expunge a written report presented by the Special Grand Jury to the Honorable Edwin W. Jones, Judge of the Common Pleas Court of Portage County, at the same time the indictments were secretly returned.

The indictments grow out of events of May 1 through May 4, 1970, that took place on and off the campus of Kent State University in Kent, Ohio. Dealing with those events on October 4, 1970, the President's Commission on Campus Unrest issued a "Special Report—The Kent State Tragedy." The Special Grand Jury Report, the validity of which is an issue in this case, attempts to chronicle the same events. The issues in these cases, as this court sees them, neither require nor permit a general factual inquiry, and this court makes no independent findings as to what transpired during those four days in May in the Kent community.

However, it is material to record that responsive to a request of the Mayor of Kent, Ohio's Governor James A. Rhodes on the evening of May 2, 1970, dispatched units of Ohio National Guardsmen to duty in Kent, Ohio to assist the local authorities. Apparently martial law was not declared. On the afternoon of May 4, 1970, confrontations involving students and Ohio National Guardsmen

climaxed on Blanket Hill in the vicinity of Taylor Hall on the university campus. Ohio National Guardsmen shot and killed four students and wounded nine other students.

Three persons are indicted for offenses alleged to have happened on Friday, May 1, 1970. These offenses include malicious injury to property and riot, second degree. Ten persons are charged with offenses alleged to have happened on Saturday, May 2, 1970. These offenses include arson of uninhabited building; attempt to burn property; throwing stones at a fireman; assault and strike a fireman; interfering with a fireman at scene of fire; riot, first degree; and riot, second degree. One person is charged with one count of inciting to riot on Sunday, May 3, 1970. With reference to Monday, May 4, 1970, 16 persons are each charged with a single count of riot, second degree; and one person is charged with a single count of inciting to riot. None of the National Guardsmen is indicted for any offense.

Representative of the contentions of both complaints is this quote from the *Hammond* complaint:

The making of the indictments, together with the [Special Grand Jury] Report was a bad-faith use of the State's legal machinery with the purpose of inhibiting the exercise of free speech and has caused and will continue to cause, unless nullified and expunged, significant chilling effect on speech that cannot be avoided by future state court adjudication.

There are 20 plaintiffs in the *Hammond* case, six of whom are indicted and are charged with riot, second degree on May 4, 1970. One plaintiff is indicted on counts of arson of uninhabited dwelling and riot, first degree on May 2, 1970. Another plaintiff is charged with counts of riot, first degree; interference with fireman at scene of fire, and throwing stones at another, all offenses alleged to have occurred on May 2, 1970. The other indicted plaintiff in the *Hammond* case is charged with riot, second

degree on May 1, 1970; with inciting to riot on May 3, 1970; and is charged with riot, first degree and interfering with fireman at the scene of fire on May 2, 1970.

Other plaintiffs in the *Hammond* case include a student of Kent State University, not indicted by the Grand Jury, who sues on behalf of himself and all other students of Kent State University; and 10 persons who describe themselves as "concerned members of the Kent State University community or elsewhere in the community of Portage County, Ohio * * *."

All plaintiffs in the *Adamek* case, 32 in number, are professors at Kent State University. The complaint charges that First, Fifth, Sixth, and Fourteenth Amendment rights are violated by the issuance of the Report. It stresses that First Amendment Rights (including academic freedom) have been jeopardized by the indictment of fellow plaintiff Professor Thomas Lough. His indictment charges him with inciting to riot on May 4, 1970.

Attorney General Paul W. Brown and his appointed Special Counsel, Robert L. Balyeat, Seabury H. Ford, and Perry G. Dickinson, are defendants in each case. They are sued individually and in their respective capacities as Attorney General of Ohio and Special Counsel to the Attorney General. Attorney General Brown appointed these Special Counsel to conduct the investigation called for by Governor Rhodes on August 3, 1970. Governor Rhodes directed Attorney General Brown to convene a Special Grand Jury in Portage County, Ohio.

In the *Hammond* case also sued are foreman Robert R. Hastings and 15 other members of the Special Grand Jury, and Lucy S. DeLeone, Clerk of the Common Pleas Court of Portage County. In the *Adamek* case, Robert W. Hastings, is sued individually and as a member of the Special Grand Jury and so are all others similarly situated.

On November 13, 1970, this court overruled a consolidated motion of the

plaintiffs in both cases to convene a three-judge court to pass on the constitutionality of Ohio's anti-riot laws (Ohio Rev.Code § 2923.52–54). As seen, these sections, adopted in Ohio in 1968, form the most frequent basis of the offenses charged in the indictments. In plaintiffs' motion it was claimed that these sections of law "on their face and as applied violate the Constitution of the United States and are, therefore, null and void." In denying the motion for a three-judge court this court concluded and determined that "there is no substantiality to the claim of unconstitutionality of the Ohio anti-riot law."

An evidentiary hearing on the remaining issues of the two actions, involving the request for permanent injunctive and declaratory relief, was held from November 23, 1970 through December 3, 1970. Following the submission of proposed findings of fact and conclusions of law, oral arguments were presented on January 5, 1971.

I.

 In considering a case that petitions a federal district court to intervene in a state criminal case it is timely to first mark the permissible limits of federal intervention. The criminal jurisdiction of our country is apportioned between the coordinate federal and state judicial systems. Under Ohio law, state grand juries or state prosecutors have exclusive jurisdiction to charge (accuse) a person with violation of a state criminal law. Only a grand jury may indict (accuse) a person of a felony. A felony is any crime for which the sentence of incarceration may exceed one year. A state grand jury may also indict a person for a misdemeanor, a crime having a lesser sentence than a felony. An accused person may waive indictment and authorize a state prosecuting attorney to charge him by criminal information. A state common pleas court has exclusive jurisdiction to try a person charged with a felony. Comparably, persons may only be required to stand for trial for federal crimes amounting to felonies upon indictment by a federal grand jury. A federal grand jury may also indict (accuse) for a misdemeanor. A United States Attorney may prosecute by criminal information in misdemeanor cases or in felony cases when accusation by indictment is waived. United States district courts (federal trial courts) have exclusive jurisdiction to try persons accused of federal crimes.

The complaints of the plaintiffs in both actions are founded on 42 U.S.C. § 1983 (1964) (deprivation of civil rights under color of state statute); and, therefore, this court has jurisdiction of these actions by virtue of 28 U.S.C. § 1343(3) (4) (1957) (jurisdiction in civil rights cases). Jurisdiction under other sections is claimed, including 28 U.S.C. §§ 2201, 2202 (1958) (declaratory judgment). Abjuring damages the plaintiffs seek declaratory and injunctive relief under 42 U.S.C. § 1983 (1964).

Title 42 U.S.C. § 1983 (1964) is a frequent foundation for cases currently being brought in federal court. Enacted April 20, 1871, the Civil Rights Act of 1871, and its successors (now section 1983), soon will be a hundred years old. As here relevant this section provides:

> Every person who, under color of any statute * * * of any State * * subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In applying section 1983, one must consider the effect of 28 U.S.C. § 2283 (1948). Known as the Anti-Injunction Law, section 2283 and its predecessors have been in force since early in this country's history. Section 2283 states:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its juris-

diction, or to protect or effectuate its judgments.

The Supreme Court of the United States recently enforced this statute in a non-civil rights case, Atlantic Coast Line R. R. v. Bhd. of Locomotive Engineers, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970). As yet the Supreme Court has reserved but not ruled on the question whether an action brought under 42 U.S.C. § 1983 (1964) may constitute an exception to 28 U.S.C. § 2283 (1948). Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) and Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968) were both based on section 1983. In these cases the Supreme Court recognizes that injunctive relief against a state criminal prosecution may be granted where irreparable injury is established. This requires proof of "special circumstances," amounting to a bad faith criminal prosecution that has a "chilling effect" on First Amendment rights.

A recent application of *Dombrowski, supra,* and *Cameron, supra,* controlling on this court, is Honey v. Goodman, 432 F.2d 333 (6th Cir., October 9, 1970), a claim based on section 1983. The majority opinion, written by Judge Anthony J. Celebrezze, affirmed the trial judge's refusal to request a three-judge court to consider the constitutionality of the Kentucky embracery law. He had declared the law constitutional. However, the case was remanded for an evidentiary hearing at which the appellants are to

bear the "heavy burden" of showing that the state instituted proceedings in bad faith and with no real hope of ultimate success, in order to chill free expression of unpopular ideas, * * *. [432 F.2d at 334]

The appellants had been indicted for embracery (a Kentucky crime defined to be "where one attempts to corrupt, or influence, or instruct a jury * * * "). The decision has direct significance because of its holding that a federal injunction against state court criminal proceedings may issue even after indict-

ment "where proceeding may technically be under way, but not where the state trial of accused had begun; * * *."

## II.

On August 3, 1970, Governor Rhodes wrote Attorney General Brown that "We have reviewed together the status of investigation of the tragic disorders at Kent State University and the City of Kent during the first days of May this year." The letter noted that the prosecuting attorney of Portage County had "informally asked my office to make $100,000 available to supplement the funds that he can expend on Grand Jury inquiries and prosecutions." He noted that his staff, the Attorney General's staff, and the Legislative Service Commission found the same answer:

[T]he State can finance a Grand Jury inquiry and any prosecutions resulting therefrom if the Governor, in present circumstances (as the General Assembly is in sine die adjournment), directs the Attorney General to investigate or prosecute.

The letter continues:

Only a Grand Jury and the Courts can diminish the half-informed and misinformed commentary on events at Kent State that still is heard. Only a Grand Jury can say who should face prosecution and for what.

Citing sections 109.02, 2939.10, and 2939.17 of the Ohio Revised Code, the Governor then directed the Attorney General of Ohio:

[T]o investigate (1) acts leading to or inducing illegal or criminal acts in any way associated with "campus unrest" that took place in the City of Kent or on the Campus of Kent State University on or about May 1, 2, 3, 4 and 5, 1970 and (2) such illegal or criminal acts themselves. Your investigation shall include the legality of official response to such illegal or criminal acts and to the general temper and situation prevailing in the environs of Kent and Kent State Uni-

versity before and during the dates mentioned.

It was this language that Judge Edwin W. Jones repeated in his charge to the Special Grand Jury. He then told the Special Grand Jury that "this, Ladies and Gentlemen, states the purpose of convening this Special Grand Jury and the area of your inquiry."

Governor Rhodes concluded his letter to Attorney General Brown by saying:

This direction requires investigation up to and including a Special Grand Jury inquiry. As specified by Section 2939.10 of the Revised Code, such proceedings will be under your exclusive supervision and control.

 In ordering an investigation of "acts leading to or inducing illegal or criminal acts in any way associated with 'campus unrest' * * *," Governor Rhodes' call appears to direct the Special Grand Jury to identify causes. Foreman Hastings apparently read the call that way. He testified the Grand Jury believed it should report "at least the causes as we saw them." However, the scope of a governor's call cannot enlarge the powers of a Special Grand Jury. Its proceedings are "of the same force and effect" as a regular grand jury, Ohio Rev.Code § 2939.17. Furthermore, under Ohio Rev.Code § 2939.10 the Attorney General and his Special Counsel have and exercise the rights, privileges, and powers of prosecuting attorneys. State ex rel. Doerfler, Prosecuting Attorney v. Price, Attorney General, 101 Ohio St. 50, 128 N.E. 173 (1920).

By letter dated August 4, 1970, Attorney General Brown informed Judge Jones of the Governor's direction to him; and he forwarded a copy of Governor Rhodes' call to investigate. His letter requested Judge Jones to select and to convene a Special Grand Jury in Portage County

for the purpose of proceeding in accordance with the foregoing on or about August 25, 1970, or as soon

thereafter as you may determine to be practicable.

Pursuant to an order of August 12, 1970, from Judge Jones, the Commissioners of Jurors of Portage County on August 18, 1970, drew the names of 285 prospective jurors to serve for the September 1970 term, "and in the case of the Special Grand Jury to serve until such time as it is discharged." The first 50 names of persons drawn from the jury wheel were summoned to appear for jury service on the Special Grand Jury "to be convened at the request of the Attorney General of the State of Ohio."

The Special Grand Jury was impaneled by Judge Edwin W. Jones on September 14, 1970. Judge Jones appointed Robert R. Hastings as foreman from outside the jury wheel as empowered by Ohio Rev. Code § 2939.02. Before he charged the Special Grand Jury, Judge Jones administered the oath prescribed by Ohio Rev. Code § 2939.06, including its provision that:

The counsel of the state, your own, and your fellows, you shall keep secret unless called on in a court of justice to make disclosures; * * *.

By Ohio Rev.Code § 2939.07 the judge is required to charge the grand jurors after being sworn as to their duty. It specifies:

[He] shall call their attention particularly to the obligation of secrecy which their oaths impose, and explain to them the law applicable to such matters as may be brought before them.

At no point in his charge did Judge Jones authorize the Special Grand Jury to file a written report. However, Foreman Robert R. Hastings, in his trial testimony, volunteered that the filing of a grand jury report came up in a discussion between him and Judge Jones in the judge's chambers on the first or second morning of the sessions. The judge's feeling that a report should be filed was

revealed by Mr. Hastings under interrogation by Mr. Sheerer:

Q Does that complete your understanding of the purpose of the Grand Jury?

A Are you referring now to the fact that we made a report in connection with the indictments?

Q Well, perhaps.

A This was also indicated to us by Judge Jones, that it was very common—in fact, practically usual—in the State of Ohio for a Grand Jury to conduct the thing, and part—at the end of the proceedings was to issue a written report. He even mentioned—and we sort of chuckled—he didn't think it would be necessary for our Special Grand Jury to visit the jail and make a report on the condition of the jail. But that he felt, in view of the seriousness of what had happened over there and the extent with which we were going to be involved in the investigation, that a report should be filed with our indictments, if any.

By order of September 5, 1970, Judge Jones and his fellow Judge Albert L. Caris had barred statements by witnesses, grand jurors, lawyers, and others. This order was relaxed on October 15, 1970. The supplemental order makes it clear that Judge Jones anticipated a report of the Special Grand Jury the next day. It reads:

1) * * * Special Counsel for the Attorney General may hold one (1) press conference on October 16, 1970 at which time they may present to the news media that portion of the report of the Special Grand Jury which is not secret and may answer only general questions pertaining to such portions of the report of the Special Grand Jury without giving any specific information, commenting on any of the evidence presented to the said Special Grand Jury or

making any interpretation of such report.

The supplemental order further provided * * * that a copy of this Supplemental Order shall be made available to the Special Counsel of the Attorney General and to all representatives of the news media participating in said press conference.

On October 16, 1970, an 18-page document was submitted to Judge Edwin W. Jones by Robert R. Hastings, foreman of the Special Grand Jury. The document consists of two titled parts. Page 1 is center-captioned:

ENTRY ON SPECIAL
GRAND JURY

IN RE THE MATTER OF THE
SPECIAL GRAND JURY:

Page 4 is headed "REPORT OF THE SPECIAL GRAND JURY." This center heading is immediately below an introduction which reads: "Also their report in writing to the Court in the following words and figures, viz:".

Bearing a file stamp "Court of Common Pleas, October 16, 1970," the entry set forth on page 1 bears the court journal stamp, "Journal 113 page 374." The entry lists the appearance of the Grand Jurors in court with their foreman and it reports his presentment of 30 bills of indictment to the court.

Pages 2 and 3 of the Special Grand Jury Report named 25 persons in alphabetical order specifying the offense or offenses of each named person. At the top of page 2 is the statement:

The following parties have not yet been arrested, and until they are, their cases are not to be entered upon the appearance docket, nor upon the trial docket, nor otherwise made public.

This language of the entry is based on Ohio Rev.Code § 2939.22 that specifies that "Secret indictments shall not be docketed by name until after the apprehension of the accused." Since the returned indictments were secret indictments, pages 2 and 3 were removed from

the document and kept in the Clerk's vault. By the time of this trial, however, all but three of the 25 indicted had been arrested. Accordingly, pages 2 and 3 have been restored to the document. Deleting the names and offenses of the three persons not then arrested it shows 22 names (see *Hammond,* Plaintiffs' Exhibit 1). Since the hearing, the Clerk has supplied the court with the identification of the offenses and the dates of the offenses, but not the names of the persons not yet arrested.

Directed to the Honorable Edwin W. Jones, Judge of Court of Common Pleas, Portage County, Ohio, the Report consists of 14 pages, 4 through 18. Each page bears the stamp of a separate journal page in the Court Journal: Journal 113 page 375 through page 389. An unlabeled preface of the Report surveys the testimony and physical evidence heard and received by the Special Grand Jury. Parts I through VII chronicle the events of May 1 through May 4, 1970, interspersing findings of riots and criminal conduct. Part VIII quotes a statement issued May 3, 1970, by 23 "Concerned Faculty," and, among other things, the Special Grand Jury says the 23 must share "responsibility for the tragic consequences of May 4, 1970." In Part IX the Special Grand Jury identifies what it determines to be the causes of the "incidents occurring on the Kent State University campus on May 2nd., 3rd., and 4th. * * *" Thus, it says "major responsibility" for these incidents rests "clearly with those persons who are charged with the administration of the University." It renders moral and social judgments on policies, attitudes, and conduct of the university administration, and some faculty and students.

Below the conclusion of the Report on page 18 appears the date October 16, 1970, the words "Respectfully submitted," and the signature "Robert R. Hastings, Foreman." Under that appears a typed entry which reads: "There being no further business for said Special Grand Jury, they are recessed subject to the further order of the Court." This

entry is signed "Edwin W. Jones, Judge—Common Pleas Court."

The only reference to the indictments that appears in the body of the Report of the Special Grand Jury is a statement in the second paragraph of the Report that the Special Grand Jury "presented 30 true bills covering 25 defendants and 43 offenses, considered by us."

### III.

A fundamental position of the plaintiffs is that the indictments are inseparably a part of the Report. Asserting that the Report is invalid, the plaintiffs argue that the indictments are tainted by the Report. Hence, it is urged that the Report, including the indictments, must be expunged.

It is evident from the journalized entry of October 16, 1970, regarding the Special Grand Jury, that the Special Grand Jury through its foreman presented to the court 30 bills of indictment, and that each indictment was endorsed a "true bill" and signed by the foreman, Robert R. Hastings. The entry reports the presentment of these bills of indictment to the court. These bills of indictment are neither physically attached to the document nor are they incorporated by reference. Each bill of indictment, endorsed a true bill, and signed by the foreman is separate and legally sufficient. Ruch v. State, 111 Ohio St. 580, 146 N.E. 67 (first syllabus) (1924). Indeed, an indictment cannot draw strength from the entry of the grand jury reporting the return of indictments. An indictment, void because it is unsigned by the foreman, cannot be cured by the entry of the grand jury that incorrectly reports that a secret indictment was signed by the foreman. Kennedy v. Alvis, 145 N.E.2d 361 (Franklin County C.P.1957).

Upon the pertinent evidence and under Ohio law determined to be applicable, it is concluded and declared that the 30 indictments are detached and self-sufficient; and they are not em-

bodied in the Report of the Special Grand Jury.

At this point it is timely to consider another claim of the plaintiffs. The plaintiffs urge that this court should find the indictments insufficient because, as one of plaintiffs' counsel argued orally, "I doubt if there is a single shred of evidence in this record that would show any basis for those indictments." He argued further that as he reads *Cameron, supra*, "at least some evidence should be offered by the prosecution to support a finding by the court that *Dombrowski* relief is not warranted, that is, there must be some evidence to show that the charges were based on something."

*Cameron, supra*, is not directly comparable. The persons charged with violating the newly enacted Mississippi anti-picketing law were being prosecuted on affidavits and arrest warrants. There were no indictments as there are in the present case. Even so the three-judge court made it clear in Cameron v. Johnson, 262 F.Supp. 873 (S.D.Miss.1966), a ruling affirmed by the Supreme Court, that the federal claim under section 1983 could not be concerned with the guilt or innocence of the state charges. The evidence received was permitted to compare court house picketing on the days involving the charges with picketing of the court house on other days for which the accused were not charged. It was deemed relevant to determine whether selective enforcement, amounting to bad faith, had occurred.

During the trial this court ruled out proposed testimony as to the events of May 4, 1970. It was offered allegedly to show bad faith of indictments that charge riot offenses on that day. The offer sought to contest a finding of the Report that "the gathering quickly degenerated into a riotous mob." Relying on Costello v. United States, 350 U.S. 359, 363–364, 76 S.Ct. 406, 100 L.Ed. 397 (1956), this court concluded that

[T]his Court cannot, and should not, assume the role of a super Grand Jury [n]or * * * should [it] assume the

role of a reviewing body to review the propriety of these indictments based on the claim here of inadequa[te] or incompetent evidence as it is offered in support of the claim of bad faith.

 The law of Ohio conforms to *Costello, supra*. Turk v. State, 7 Ohio 240, Pt. 2; State v. Selby, Ohio Com.Pl., 126 N.E.2d 606, 607, 69 Ohio Law.Abst. 481 (1955) and Wickline v. Alvis, 103 Ohio App. 1, 144 N.E.2d 207 (1957). Thus, in State v. Selby, the court ruled:

Where an indictment of the Grand Jury is regular upon its face, there is a conclusive presumption that there was sufficient evidence to warrant the indictment; * * * and, consequently even the Court itself cannot inquire whether there was sufficient evidence before the Grand Jury to warrant its return of the indictments in question.

The indictments returned by the Portage County Special Grand Jury are deemed to be presumptively valid; and it is concluded that to show bad faith the plaintiffs in these cases cannot offer evidence that bears on the evidentiary adequacy or sufficiency of the indictments. In this trial it is found and declared that the state was under no duty to offer evidence to support the indictments.

## IV.

One of the proposed conclusions of law of the *Hammond* plaintiffs states a basic claim of all plaintiffs. It reads:

By issuing its Report, the special Grand Jury violated the rights of the plaintiffs and other persons indicted to a fair trial in that in the said Report the special Grand Jury commented, made findings and conclusions and determinations of fact and law with respect to the very events in the charges set forth in said indictments and made unlawful predeterminations of guilt of those indicted, thereby depriving them of the presumption of innocence provided by the Constitution of the State of Ohio and the Constitution of the United States and in viola-

tion of the rights, privileges and immunities of the indicted plaintiffs under 42 U.S.C., Section 1983.

The first syllabus of the opinion in State ex rel. Doerfler, Prosecuting Attorney v. Price, Attorney General, *supra,* defines the function of a grand jury:

> The grand jury, in its inquest of crimes and offenses, and in its finding and presentation of indictments to the court of common pleas, does not exercise a judicial function. It only acts as the formal and constitutional accuser of crime and those it believes to be probably guilty thereof.

■ Since the grand jury "only acts as the formal and constitutional accuser of crime" and since it "does not exercise a judicial function," it is fundamental that grand jury proceedings are non-adversary. In Wickline v. Alvis, *supra,* 144 N.E.2d at 210–211, Judge Bryant wrote:

> Proceedings of the grand jury are not a trial but are more in the nature of an inquest. There are no parties, and no defendant has a right to appear before the grand jury; and, if he does appear, it is only upon permission granted and he then appears as a witness, not a defendant, and he has no right to take his attorney along with him.

Thus the instructions of Judge Jones to the Special Grand Jury are on sound legal ground when he told them:

> As a Grand Jury you are not a trying body. You are simply an accusing body. Therefore it is not your province to determine in any case whether a person who may be accused of having committed a crime or offense is really guilty.

He told the Jury that it had "a different duty to perform." Its duty is

> to determine whether or not there is sufficient evidence to put the accused on trial before a petit jury or a trial jury.

■ As to the evidence needed to "find" an indictment, Judge Jones' instructions were in general terms but accurate. He told the Grand Jurors:

> [Y]ou ought to be fairly convinced that the crime charged has been committed insofar as the evidence goes.

He added:

> [T]he Grand Jury ought not to indict unless convinced that the evidence produced, if it were unexplained and uncontradicted, would be sufficient to authorize a petit jury to convict that person of the crime which is imputed to him.

These instructions emphasize that the grand jury is not expected to hear all the evidence. The Ohio law is unequivocal. The grand jury proceedings is an inquest and not a trial. An accused party is not permitted to have his attorney present. Hence, there can be no cross-examination of witnesses, so essential to bring out all the evidence.

Contrary to the judge's explicit instruction that the Special Grand Jury is "not a trying body," the Report in Parts I through VII, chronicling the events of May 1 through May 4, contains 70 findings.

As is true of pages 1, 2, and 3 of the "ENTRY ON SPECIAL GRAND JURY," the first two paragraphs of the "REPORT OF THE SPECIAL GRAND JURY" closely follow the form and wording of the standard grand jury form published and sold by Barrett Brothers, Publishers of Springfield, Ohio, including the last sentence of the second paragraph, which reads:

> The business of this Special Grand Jury has been transacted in an expeditious a manner as possible.

Then the Report takes off on its own. Because of its relevance, and since defense counsel alluded to the form in oral argument, a blank form, *sua sponte,* is designated a court exhibit and is made a part of the record.

In repeating in paragraph 3 that it received testimony from more than 300 witnesses, the Special Grand Jury did not disclose any secret. This total num-

ber could be computed from the public court records of the names of witnesses who were subpoenaed or who appeared before the Grand Jury. But the Special Grand Jury violated its oath of secrecy when it asserted that these witnesses

have fairly represented every aspect, attitude, and point of view concerning the events which occurred in the city of Kent, Ohio and on the campus of Kent State University during the period of May 1, 1970 to May 4, 1970, inclusive.

The Report further breaches secrecy when it alleges that:

The persons called as witnesses, the order of their appearance, and the questions presented, clearly indicated an effort at complete impartiality with a full and complete disclosure of all available evidence. We are satisfied that each of these objects was accomplished.

In his charge, Judge Jones admonished the Grand Jurors that:

What is revealed in the Grand Jury room must remain locked forever in your minds and breasts unless you are required under the law to make disclosures in a Court of Justice.

Yet, in clear violation of this admonition of secrecy the Grand Jury reported that it

viewed and otherwise received all physical evidence believed to have any probative value, including numerous audio tapes, photographs, motion picture films, and physical evidence recovered at the scene.

Further opening their "locked * * * minds and breasts" the Grand Jury stated that it

has had available the independent investigative reports of the Federal Bureau of Investigation, Ohio Highway Patrol, Ohio Bureau of Criminal Identification and Investigation, and all other police agencies involved.

It then added:

Their reports and all pertinent information and evidence have been examined in detail.

To the extent that the Special Grand Jury Report described the evidence before the Jury, this court permitted trial interrogation of Special Counsel. Counsel's testimony indicates that this last quoted statement of the Report is partly inaccurate and, therefore, misleading to the reader. The identified investigative reports were available to the Grand Jury. However, these reports were not introduced into evidence. Understandably they were not read in their entirety by the Grand Jurors. (The FBI report was described as consisting of 10,000 pages of statements of witnesses. It contains no conclusions.) Instead, selected portions of some of the volumes were read to the Grand Jury by Special Counsel. Special Counsel had examined the reports in detail; the Grand Jury did not. Apparently Special Counsel told the Grand Jury that it had examined the investigative reports in detail. But this is not what the Grand Jury Report states. The preface of the Report reflects an undoubtedly sincere effort to convince the reader of the depth and impartiality of its investigation, the credibility of its findings, and the cogency of its later moral and social judgments. Thus, the preface further says:

In addition, the Grand Jury has received a substantial amount of additional information and evidence that was not available to the police agencies at the time of their investigations. Some facts were discovered subsequent to the investigation of other agencies.

As held in *State ex rel. Doerfler, supra,* the grand jury serves only as an "accuser of crime" that makes findings of indictments based on probable cause. One of the Special Counsel admits that no such instruction was given to the Grand Jury. The Report fails to disclose that the Special Grand Jury's determinations and findings can rest only on probable cause and "insofar as the evidence goes," to quote from Judge Jones' charge.

Instead, the Special Grand Jury openly assumes the role of a careful trier of the fact as it concludes the preface of its Report:

The Grand Jurors have determined numerous questions of fact relative to the issues presented. The Grand Jurors wish to stress the fact that our findings are entirely our own and no outside influences were exerted. In view of the many conflicting and contradictory accounts previously published concerning these events, we feel it appropriate to report those findings at this time. They are as follows:

Part I of the Report states, in part:

The incidents originating on North Water Street in Kent, Ohio on Friday, May 1, 1970, and which spread to other parts of the downtown area and the University, constituted a riot.

We find that no provocation existed for the acts committed there and that many persons participating in this riot were not students, but were of a type who always welcomed the opportunity to participate in the unjustified destruction of property.

One of the 25 persons indicted is indicted for the offense of riot, second degree, a misdemeanor (Ohio Rev.Code § 2923.52), on May 1, 1970. He is a plaintiff in the *Hammond* action. Another person is indicted for malicious injury to property, a misdemeanor (Ohio Rev. Code § 2901.01) or felony (Ohio Rev. Code § 2907.08).

Part II of the Report states, in part:

We find that the rally on the Commons on Saturday, May 1, 1970, which resulted in the burning of the R.O.T.C. Building, constituted a riot. There can never exist any justification or valid excuse for such an act. The burning of this building and the destruction of its contents was a deliberate criminal act committed by students and non-students. Nor did the rioters stop with the burning of the R.O.T.C. Building. They also set fire to the archery shed and moved from there to East Main Street on the front campus where they engaged in further acts of destruction and stoned the members of the National Guard as they entered Kent.

Arson is arson, whether committed on a college campus or elsewhere. The fact that some of the participants were college students changes nothing, except perhaps to further aggravate the seriousness of the offense.

With reference to the indictments involving May 2, 1970, two persons are indicted for attempting to burn property, a felony (Ohio Rev.Code § 2907.06). Three persons, including one plaintiff, are indicted for the offense of arson of uninhabited building, a felony (Ohio Rev. Code § 2907.03). Eight persons, including three plaintiffs, are indicted for the offense of riot, first degree, a felony (Ohio Rev.Code § 2923.53). One person is indicted for the offense of riot, second degree, a misdemeanor (Ohio Rev. Code § 2923.52). Six persons, including two plaintiffs, are indicted for the offense of interfering with firemen at scene of a fire, a misdemeanor (Ohio Rev.Code § 2923.43). One person, a plaintiff, is indicted for the offense of throwing stones at another, a misdemeanor (Ohio Rev.Code § 2901.251), and two persons are indicted for the offense of assaulting and striking a fireman, misdemeanor or felony (Ohio Rev.Code § 2901.252).

Part III of the Report is devoted to detailed findings that allege that the Kent State University police department is totally inadequate. Referring to the fire at the ROTC Building on May 2, 1970, the Report adds to earlier findings:

The persons who attacked the firemen numbered no more than 4 or 5. The total number of those persons who actually attempted to fire the building did not exceed ten or twelve. It is obvious that the burning of the R.O. T.C. building could have been prevented with the manpower then available. If the burning had been prevented it is reasonable to believe that the events

which followed on May 3rd and 4th would not have occurred.

Part IV of the Report commences by saying:

The Grand Jury finds that the events of Sunday, May 3, 1970, on campus and at the corner of Lincoln Street and East Main Street in Kent, Ohio constituted a riot.

There follows a long paragraph which recites findings as to these events. One of the plaintiffs is indicted for inciting a riot on May 3, 1970, a felony, Ohio Rev. Code § 2923.54).

Part V of the Report, except for the last sentence, reads:

The gathering on the Commons on May 4, 1970, was a violation of the directive of May 3rd issued by the University Vice President in charge of Student Affairs. We find that all the persons assembled were ordered to disperse on numerous occasions, but failed to do so. Those orders, given by Kent State University policemen, caused a violent reaction and the gathering quickly degenerated into a riotous mob. It is obvious that if the order to disperse had been heeded, there would not have been the consequences of that fateful day. Those who acted as participants and agitators are guilty of deliberate, criminal conduct * *.

Part VII of the Report also relates to the events of May 4, and elaborates the findings of Part V. Neither Part records the killing of the four students and the injuring of nine others by National Guardsmen. However, the Special Grand Jury indirectly refers to the killings in the last sentence of the opening paragraph of Part VII. The entire paragraph reads:

It should be made clear that we do not condone all of the activities of the National Guard on the Kent State University campus on May 4, 1970. We find, however, that those members of the National Guard who were present on the hill adjacent to Taylor Hall on May 4, 1970, fired their weapons in the honest and sincere belief and

under circumstances which would have logically caused them to believe that they would suffer serious bodily injury had they not done so. They are not, therefore, subject to criminal prosecution under the laws of this state for any death or injury resulting therefrom.

To factually support its legal conclusion that the Guardsmen acted in self-defense for the unmentioned killings, Part VII goes on to make findings that relate to the movements of the National Guard across the "Commons" up Blanket Hill near Taylor Hall, to and from the practice football field, and back to Blanket Hill. The Report speaks of 58 Guardsmen injured by rocks and other objects. The Report refers to "several hundred hostile rioters" who forced the Guard

to retreat back up the hill toward Taylor Hall under a constant barrage of rocks and other flying objects, accompanied by a constant flow of obscenities and chants such as "KILL, KILL, KILL."

The Report then states:

Photographic evidence has established, beyond any doubt, that as the National Guardsmen approached the top of the hill adjacent to Taylor Hall, a large segment of the crowd surged up the hill, led by smaller groups of agitators approaching to within short distances of the rear ranks of the Guardsmen.

With reference to May 4, 1970, 15 persons, including six of the *Hammond* plaintiffs, are indicted for the offense of riot, second degree, a misdemeanor (Ohio Rev.Code § 2923.52). Professor Thomas Lough is indicted for inciting to riot, a felony (Ohio Rev.Code § 2923.54).

Findings and conclusions of the Special Grand Jury Report spanning the events of May 1 through May 4, 1970, have been quoted. These findings and conclusions cover or coincide with essential elements of the offenses that are charged in the indictments returned by the Special Grand Jury.

For each of the four days there is a finding that the events constituted a riot. Establishing existence of a riot is a basic and essential element of at least 27 of the 43 charged offenses. Thus, the Special Grand Jury finds as true a basic element (in these 27 offenses) that the State is required to prove to a petit jury beyond a reasonable doubt.

■ Finding the truth of essential elements of the crimes charged, for example that a riot had occurred, was not required of the Grand Jury, even in its secret deliberations. "As the formal and constitutional accuser of crime" a grand jury indicts "those it believes to be probably guilty thereof." State ex rel. Doerfler, *supra*, first syllabus. In its secret deliberations, to indict, a grand jury need only find that each essential element of the indicted crime is probably true.

At one point the Report finds that the evidence is "beyond doubt," an even more exacting standard than "beyond a reasonable doubt." In addition, words connoting guilt occur throughout the findings. Thus, for example, five offenses of arson or similar offenses are charged in the indictments, yet the Report makes a specific finding that "arson is arson whether committed on a college campus or elsewhere." The juxtaposition of the finding (in legal language) that the National Guardsmen who used their weapons on May 4th acted in self-defense is another way of saying that the "rioters" are guilty.

In rendering these written findings in its Report the Special Grand Jury takes over the duty of a petit jury, acts as a trying body, and determines guilt. Simultaneously performing its real function as an accusing body it returned 30 indictments against 25 persons involving 43 offenses.

"A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). Similarly, Sheppard v. Maxwell, 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966), declares:

Due process requires that the accused receive a trial by an impartial jury free from outside influences.

Recently, in In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970), the Supreme Court explicitly holds that:

[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

Earlier in the opinion the Court holds that:

[This] standard provides concrete substance for the presumption of innocence—that bedrock "axiomatic and elementary" principle whose "enforcement lies at the foundation of the administration of our criminal law." Coffin v. United States, [156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895)]. 397 U.S. at 363, 90 S.Ct. at 1072.

In the trial of any of the persons indicted by the Special Grand Jury, prospective petit jurors surely will be asked various questions on voir dire examination. One essential question will be whether they accept the principle that a man is presumed innocent until and unless he is proved guilty by evidence beyond a reasonable doubt. They will be asked if they will be able to follow this law and presume the innocence of the accused. They will also be asked whether they will be able to accept and follow the law that an indictment is merely an accusation of crime, and that an indictment is neither evidence of guilt nor does it permit an inference of guilt. Assume that at the time of trial the Special Grand Jury Report remains journalized as an entry of an official body of citizens with its findings that in effect say that the 25 indicted persons are guilty. Under those circumstances it is unreasonable to expect or ask a prospective juror honestly to say and to promise to completely disregard these findings and to treat the indictment not as proof

of guilt but only as an accusation of crime.

The Special Grand Jury had a right to indict if the evidence before it indicated probable guilt. That right is not here questioned. Accounting to no one but its own conscience, as long as any indictment was impartially and fearlessly returned upon the basis of evidence heard or received, the Special Grand Jury would then have acted solely and lawfully as an accusing body. Because the Report harms the federal constitutional rights of the indicted persons these conclusions are reached as to the claim under consideration.

 It is concluded and declared that the Report's continued existence in court files and in the court's journal irreparably injures the right of each of the accused indicted to a fair trial, protected by the Due Process Clause. It is, therefore, found and declared that the continued vitality and official status of the Grand Jury Report deprive the indicted plaintiffs, and the other indicted persons similarly situated, of rights arising under the Constitution in violation of 42 U.S.C. § 1983 (1964).

The *Hammond* plaintiffs, joined by the *Adamek* plaintiffs, assert that under the doctrine of pendent jurisdiction this court should hear and determine the claim of the plaintiffs that under Ohio law the Special Grand Jury had no right to issue its report. Invalidity and illegality of the Special Grand Jury Report under Ohio law, therefore, is said to furnish, as a state claim, an additional ground upon which the Special Grand Jury Report should be expunged.

 The doctrine of pendent jurisdiction is best and most fully elucidated in United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). It is said that "the federal claim must have substance sufficient to confer subject matter jurisdiction on the court." Federal provisions 42 U.S.C. § 1983 (1964) and 28 U.S.C. § 1343(3) (4) (1957) give this court jurisdiction to hear and to determine the claims in these cases. It is said *United Mine Workers, supra,* at 725, 86 S.Ct. at 1138, "the state and federal claims must derive from a common nucleus of operative fact." The Special Grand Jury Report and the evidence surrounding its issuance have been analyzed in previous consideration of the federal claims in these cases. The same nucleus of fact now provides basis for a consideration and determination of the state claim that the Special Grand Jury Report is illegal and invalid. There is also conformance to these final requirements of *Gibbs, supra* at 725, 86 S.Ct. 1130.

The federal and state claims without regard to their character are such that plaintiffs would ordinarily be expected to try them all in one judicial proceeding. Substantiality of the federal issues exists. Hence, it is concluded that there is power in this court to hear the whole.

 There are no common-law crimes in Ohio; nor is there common-law criminal procedure in Ohio. *See* State v. Whitmore, 126 Ohio St. 381, 185 N.E. 547, 548 (1933). The Ohio Code of Criminal Procedure, Chapter 2939: Grand Juries, contains only two sections that make provision for a grand jury report.

 With reference to its required visit to the county jail once a term, the grand jury is directed by Ohio Rev.Code § 2939.21:

They shall report to the court of common pleas in writing whether the rules prescribed by such court have been faithfully kept and observed, and whether the law for the regulation of county jails has been observed or violated, stating the particulars of such violation.

A further report is directed by Ohio Rev.Code § 2939.23. It provides:

If an indictment is not found by the grand jury, against an accused who has been held to answer, such fact shall be reported by the foreman to the court of common pleas.

The expression of specific power to issue these particularized reports by clear implication of law precludes a grand jury's lawful exercise of any unexpressed power to render other types of written reports.

Pressing the claim that there is common-law authority to authorize the issuance of written grand jury reports, the defendants argue that *State ex rel. Doerfler, supra,* provides authority for its position. Defendants rely on this language in the body of the opinion at 55 of 101 Ohio St., at 174 of 128 N.E.

> In short, the grand jury belongs to the people, to the government, and is not an adjunct of the court. The grand jury sits upon its own adjournments, and is comparatively without limit in the scope of its investigation, the bills that it may return, or the *general findings* that it may make. [Emphasis added by this court.]

■ Defendants claim that the words "general findings" authorize a grand jury to report findings of fact of the type that are contained in the Special Grand Jury Report under consideration. Defendants' reliance on *Doerfler, supra,* is misplaced. *Doerfler* was decided in 1920 before the adoption in 1929 of the Ohio Code of Criminal Procedure. Hence, whatever the law may have been as to grand jury procedure in 1920 it was codified in 1929. The Ohio Code of Criminal Procedure makes no provision for a report of the type represented by the Special Grand Jury Report. The about quoted language of the opinion on which the defendants rely is not carried into the syllabus of the case. The law of an Ohio Supreme Court opinion is found in the syllabus, Cassidy v. Glossip, 12 Ohio St.2d 17, 231 N.E.2d 64 (1967). Finally, the words "general findings" must be evaluated in the context of a distum that is typical of Judge Wanamaker's style of opinions that so often stresses broad and historic legal principles and the fundamental rights of the people. Either his precise intended meaning of "general findings" cannot be fathomed or these words refer to "find-

ing, * * * of indictments," a phrase found in syllabus 1 of the opinion, quoted earlier in this opinion.

The only reported Ohio decision that deals with grand jury reports is State v. Robinette, 143 N.E.2d 186, 187, 188 (C.P. Pike County, 1957). There a plea of abatement was sustained to a two-count perjury indictment. One of the grounds of the plea was that:

> The Grand Jury out of which the indictment grew was investigating a civil matter over which it had no jurisdiction and not a criminal matter as provided for by law as its report shows.

According to the opinion of the trial judge "(t)he Grand Jury reported that the evidence presented before it justified the action of the Hospital Board in selecting this site * * *." The opinion continues:

> From this report the only conclusion which can be reached is that the Grand Jury had constituted itself as a reviewing body to pass upon the wisdom and authority of the Hospital Board in choosing the site selected. There is no hint of any criminal act or other irregularity having been committed by the Board or even of any criminal investigation by the Grand Jury with respect to the Board and its actions and decisions.

In one sentence the court then described the authority of an Ohio grand jury. He said:

> It must be borne in mind that outside of inspecting the County Jail, the Grand Jury's sole duty and authority are the investigations of crimes and offenses.

The court then added:

> [The Grand Jury] has no right or authority as an advisory board or reviewing body as to other public officers, board, commissioners or authorities.

■ Though unstated by Judge Reynolds his conclusion conforms to a relevant constitutional principle. The grand jury in its inquest of crimes and

offenses is part of the judicial branch of government. Like other branches of government the judicial branch is subject to the doctrine of separation of powers. State ex rel. Finley, Judge v. Pfeiffer, Bd. of County Commissioners, 163 Ohio St. 149, 126 N.E.2d 57 (Ohio Sup.Ct. 1955). The grand jury is part of the judicial branch of government and is separate and distinct from the legislative and executive branches of government; and the grand jury, therefore, may not "impinge upon the authority or rights of the others," *Finley, supra,* at 149, 126 N.E.2d at 58.

Hence, a grand jury is without authority to issue a report that advises, condemns or commends, or makes recommendations concerning the policies and operation of public boards, public officers, or public authorities. Protection of the "doctrine of the separation of powers" is carefully developed and relied on in a widely quoted and authoritative decision, Application of United Electrical, Radio & Machine Workers, 111 F.Supp. 858 (S.D. N.Y.1953), in which Judge Edward Weinfeld ordered expunged a "presentment" of a grand jury that was actually a report. The grand jury had returned no indictments. While not indicting officials of the Union the report in part stated that non-Communist affidavits filed with the NLRB by officials of the Union are not "worth the paper they are written on." It further stated that the filing of such affidavits was a "subterfuge;" and that there was "'obvious non-compliance' with § 9(h) of the Labor Management Relations Act," *Application, supra* at 860.

Moreover, a report of an Ohio grand jury is issued without authority if the report violates the grand jury's secrecy against disclosure of evidence. In re Klausmeyer, 24 Ohio St. 2d 143, 146, 265 N.E.2d 275, 277, 278 (Dec. 16, 1970), holds that the proceedings of an Ohio grand jury "must be legally sealed against divulgence." They "must be kept inviolate, unless a court of competent jurisdiction determines otherwise after special circumstances have been revealed in an appropriate hearing." A report of an Ohio grand jury, therefore, violates the oath of the grand jury and is, therefore, without authority, when it purports to summarize the evidence received by the grand jury or purports to make findings based upon the evidence. This conclusion conforms to a further conclusion of Judge Weinfeld in *Application, supra,* 111 F.Supp. at 866:

> In issuing the report based on evidence taken before them as an official body, they offended the rule of secrecy and the sanctity of their oaths.

Attorney General Brown in his testimony and counsel for defendants in their arguments rely on the custom of the filing of grand jury reports in some Ohio counties. Writing on "The Grand Jury," as a common pleas judge in Cuyahoga County, this court commented on the legality of this custom:

> The great strength of the grand jury is its broad investigative power into the possible commission of crime. It has no right or authority as an advisory board or reviewing body as to other public officers, boards, commissioners or authorities. However, a grand jury's only statutory authority to report is to return a true bill or a no bill and to report in writing concerning the county jail. Nevertheless in Cuyahoga County Common Pleas Court, and in other courts, grand juries have followed the custom of preparing a written report on matters generally coming to their attention during the term. When these reports describe some condition relating to the apparent cause or recommended cure for crime, as long as no public officials or private citizens are singled out for derogatory comment, they are, though without express or implied foundation in law, harmless and may serve some good.

> But when a report does not indict, when it refers to public officials or private citizens by name or identity in a critical or defamatory manner,

then the report is unlawful and harmful. It may be suppressed or expunged. ["The Grand Jury, The City," published by the City Club, Vol. XLVIX, No. 24, Feb. 10, 1964.]

Eleven years earlier Judge Weinfeld distinguished between grand jury reports that are unlawful because they singled individuals for accusation or condemnation, and reports that only deal with general conditions in a community. As to the latter, he said in *Application, supra* at 869:

> We are not here concerned with reports of a general nature touching on conditions in the community. They may serve a valuable function and may not be amenable to challenge.

■ From whatever standpoint one examines the lawfulness of an Ohio grand jury to issue a report, it is concluded and determined that whenever a report transgresses in any of the respects heretofore considered, the report under Ohio law is issued illegally and without lawful authority. A report that so offends is subject to expungement.

As to the indicted plaintiffs and the remaining indicted persons on whose behalf the indicted plaintiffs bring this action, it is determined and declared that the Report is issued unlawfully in violation of the Grand Jury's oath of secrecy since its findings and conclusions in Parts I through VII itemize and comment upon the evidence heard and received by the Special Grand Jury. The vice of the violation of the oath of secrecy is that the Special Grand Jury finds commission of criminal offenses and ascribes guilt to participants in the described incidents. Involving the same subject matter the Special Grand Jury concurrently returned 30 indictments against 25 persons for 43 offenses. These findings and conclusions, unlawful violations of the Grand Jury oath of secrecy, prejudice the indicted persons. If allowed to stand these findings and conclusions will irreparably injure their right to a fair trial. As Judge Weinfeld ruled, *Application, supra* at 869:

The wide-spread and unfavorable publicity attendant upon the filing of the report might well prejudice a prospective defendant's right to a fair trial—the right of every defendant, no matter what his alleged offense.

## VI.

■ The non-indicted plaintiffs claim that Parts VIII and IX of the Report of the Special Grand Jury deprive them of constitutional rights under color of state law in violation of 42 U.S.C. § 1983; and that the issuance of the Report, as to them, is unlawful under state law. Part VIII of the Report begins by saying:

> Among other persons sharing responsibility for the tragic consequences of May 4, 1970, then must be included the "23 concerned faculty of Kent State University" who composed and made available for distribution on May 3, 1970, the following document:

"The appearance of armed troops on the campus of Kent State University is an appalling sight. Occupation of the town and campus by National Guardsmen is testimony to the domination of irrationality in the policies of our government.

"The President of the United States commits an illegal act of war and refers to his opposition as 'bums.' That students and faculty and, indeed, all thinking people reject his position is not only rational but patriotic. True, burning a building at Kent State University is no joke; we reject such tactics. Yet the burning of an ROTC Building is no accident. We deplore this violence but we feel it must be viewed in the larger context of the daily burning of buildings and people by our government in Vietnam, Laos, and now Cambodia.

"Leadership must set the example if it is to persuade. There is only one course to follow if the people of this country—young and old—are to be convinced of the good faith of their

leaders: The war must stop. The vendetta against the Black Panthers must stop. The Constitutional rights of all must be defended against any challenge, even from the Department of Justice itself. If Mr. Nixon instead continues his bankrupt, illegal course, the Congress must be called upon to impeach him.

"Here and now we repudiate the inflammatory inaccuracies expressed by Governor Rhodes in his press conference today. We urge him to remove the troops from our campus. No problem can be solved so long as the campus is under martial law.

"We call upon our public authorities to use their high offices to bring about greater understanding of the issues involved in and contributing to the burning of the ROTC building at Kent State University on Saturday, rather than to exploit this incident in a manner that can only inflame the public and increase the confusion among the members of the University community.

"Signed by 23 concerned faculty, Kent State University, Sunday Afternoon,

May 3, 1970."

The Report describes the distribution of this "unusual document * * * in the various dormitories situated on the Kent State University campus during the late afternoon and early evening of May 3, 1970." After noting that the office and facilities of the Dean for the Faculty Council (Ombudsman) were made available for the preparation of the document, the Report continues:

If the purpose of the authors was simply to express their resentment to the presence of the National Guard on campus, their timing could not have been worse. If their purpose was to further inflame an already tense situation, then it surely must have enjoyed some measure of success. In either case, their action exhibited an irresponsible act clearly not in the best interests of Kent State University.

The Report continues:

Although the 23 persons referred to at the close of the statement did not actually affix their signatures to the document, they, together with one additional party, did leave their signatures with the Dean for the Faculty Council as evidence of their authorship and approval.

It should be pointed out that at least 60 faculty members were invited to the meeting, but a majority apparently elected not to be associated with the product that resulted.

Referring to the plaintiffs who are among the 23 faculty members who issued the statement of May 3, 1970, counsel for the *Adamek* plaintiffs claims:

The accusation against such plaintiffs violate rights protected by the Fifth, Sixth, and Fourteenth Amendments * * *.

The protected rights claimed to be violated are in substance that the 23 faculty members were given no notice of the charges against them prior to the issuance of the Report of the Special Grand Jury; that the Grand Jury did not provide the 23 with an opportunity to "confront and cross examine their accusers, to determine the factual basis for charges against them or to present evidence in their own behalf."

Though the 23 faculty members did not sign the letter of May 3, 1970, and though the Special Grand Jury Report does not name them, it is apparent from the Report that the 23 faculty members comprise an identifiable class. The names of the signers are known to the University administration, the Report makes clear, and it is reasonably probable that the names are known to some other faculty members, at least.

By the quoted language of Part VIII the Grand Jury Report charges these 23 identifiable members of the faculty with complicity for the "tragic consequences of May 4, 1970." The Grand Jury indirectly says that the 23 intended to "inflame an already tense situation." The Grand Jury directly charges them

with "an irresponsible act." Yet, though critical and condemnatory, the charges stop short of accusing the 23 faculty members of either specific offenses or general criminal conduct.

It follows that there is no denial of their rights of Due Process of law as guaranteed by the Fifth and Fourteenth Amendments. Further, these charges do not deprive the 23 faculty members of their rights under the Sixth Amendment, made applicable to the states by the Fourteenth Amendment, "to be informed of the nature and cause of the accusation; to be confronted with the witnesses against [them] * * *."

However, it is determined and declared that these charges, bordering on criminal accusations, against the 23 identifiable faculty members, made by the Special Grand Jury, a formal accusing body of Portage County, irreparably impair and injure the right of these 23 faculty members to their protected right of free expression, protected by the First Amendment made applicable to the states by the Fourteenth Amendment. It is further found and declared that the charges in Part VIII, made under color of state law, deprive the plaintiff faculty members and other faculty members within the identifiable class of 23 of constitutional rights in violation of 42 U.S.C. § 1983 (1964).

Furthermore, Part VIII of the Report is unlawfully issued under Ohio law because the Report censures the 23 "concerned faculty" and makes accusations against them that border on criminal charges while refraining from indicting any of these 23 faculty members in connection with their statement of May 3, 1970.

A further claim resting on 42 U.S.C. § 1983 (1964) is in a proposed conclusion of law of the non-indicted *Adamek* plaintiffs. It reads:

Those non-indicted plaintiffs who are members of the faculty at Kent State University have been subjected by defendants to deprivation of rights protected by the first, sixth, and fourteenth amendments to the Constitution of the United States by reason of the fact that they have been criticized by an official accusatory body of the State of Ohio for performance of their professional duties at Kent State University.

The proposed conclusion of law continues:

Criticism of said plaintiffs for over-emphasizing dissent in the classroom and teaching the negative side of our institutions of government constitutes an invasion of freedom of speech effected in a manner violative of due process of law. * * *

This proposed conclusion of law stems from Part IX of the Report of the Special Grand Jury that begins by saying:

We find that the major responsibility for the incidents occurring on the Kent State University campus on May 2nd, 3rd, and 4th rests clearly with those persons who are charged with the administration of the university. To attempt to fix the sole blame for what happened during this period on the National Guard, the students or other participants would be inconceivable. The evidence presented to us has established that Kent State University was in such a state of disrepair, that it was totally incapable of re-acting to the situation in any effective manner. We believe that it resulted from policies formulated and carried out by the University over a period of several years, the most obvious of which will be commented on here.

Part IX continues:

The administration at Kent State University has fostered an attitude of laxity, over-indulgence, and permissiveness with its students and faculty to the extent that it can no longer regulate the activities of either and is particularly vulnerable to any pressure applied from radical elements within the student body or faculty.

The first example the Grand Jury gives is the "delegation of a disciplinary

authority under a student conduct code which has proven totally ineffective." After devoting several paragraphs to this first example, the Report then states:

A second example of where the University has obviously contributed to the crisis it now faces is the over-emphasis which it has placed and allowed to be placed on the right to dissent. Although we fully recognize that the right of dissent is a basic freedom to be cherished and protected, we cannot agree that the role of the University should be to continually foster a climate in which dissent becomes the order of the day to the exclusion of all normal behavior and expression.

The Report continues:

We received the impression that there are some persons connected with the University who believe and openly advocate that one has a duty rather than a right to dissent from traditionally accepted behavior and institutions of government. This is evident by the administrative staff in providing a forum and available facilities for every "radical group" that comes along and the "speakers" that they bring to the campus.

After critically referring to certain student organizations that received official recognition from the University, the Report continues:

A further example of what we consider an over-emphasis on dissent can be found in the classrooms of some members of the University faculty. The faculty members to whom we refer teach nothing but the negative side of our institutions of government and refuse to acknowledge that any positive good has resulted during the growth of our nation. They devote their entire class periods to urging their students to openly oppose our institutions of government even to the point of where one student who dared to defend the American flag was ridiculed by his professor before his classmates.

We do not mean to suggest that these faculty members represent a majority of the faculty at Kent State University. To the contrary, we suspect that they form a small minority of the total faculty, but this does not mean that their presence should be ignored.

The Report does not identify this assumed "small minority of the total faculty." Since no faculty members are specifically identified and since the Report's reference to the faculty as a class does not either generally or specifically charge violation of any criminal offense, the claim of the *Adamek* plaintiffs based on the Fifth and Sixth Amendments is untenable.

The claimed violation of First Amendment rights violative of Due Process presents a different matter. Let us assume a member of the Kent State faculty reads the Grand Jury's criticism of "over-emphasis on dissent * * * in the classrooms of some members of the University faculty" and the Report's comment that this dissent "becomes the order of the day to the exclusion of all normal behavior and expression." He may reasonably believe that people in the Kent community (university and city) who have read Parts VIII and IX of the Report, may well think the Report may refer to him. People in the community may well believe that a particular faculty member is one of the "small minority of the total faculty" who depart from "all normal behavior and expression."

A Report of the Special Grand Jury, an official accusatory body of the community, that criticizes faculty members for "over-emphasis on dissent," thus seeking to impose norms of "behavior and expression," restricts and interferes with the faculty members' exercise of protected expression. The record reveals that this is happening.

Impairment of First Amendment freedom of expression is directly resulting from the Special Grand Jury Report. This is disclosed by candid and credited testimony of members of the

faculty who appeared as witnesses. Because of the Report instructors have altered or dropped course materials for fear of classroom controversy. For example, an assistant professor of English, after reading the Report, "scratched three poems" from her outline in her Introduction to Poetry course. The poems are "Politics" by William Butler Yeats, "Prometheus" by Lord Byron, and "Dover Beach" by Matthew Arnold.

In "Politics," Yeats writes "And maybe what they say is true/of war and war's alarms."

A university professor may add or subtract course content for different reasons. But when a university professor is fearful that "war's alarm," a poet's concern, may produce "inflammatory discussion" in a poetry class, it is evident that the Report's riptide is washing away protected expression on the Kent campus.

Other evidence cumulatively shows that this teacher's reaction was not isolated. The Report is dulling classroom discussion and is upsetting the teaching atmosphere. This effect was described by other faculty witnesses. When thought is controlled, or appears to be controlled, when pedagogues and pupils shrink from free inquiry at a state university because of a report of a resident Grand Jury, then academic freedom of expression is impermissibly impaired. This will curb conditions essential to fulfillment of the university's learning purposes.

Issued by a Grand Jury purporting to act under the color of state law, the Report is not protected by the First Amendment as suggested by Attorney General Brown. "The freedom of speech and of the press * * * is * * * secured to all *persons* by the Fourteenth against abridgment by a state." (Emphasis added) Schneider v. State, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939). Freedom of speech is a personal liberty that cannot be abridged by any arm of the state. An arm of the state, in this instance a grand jury, cannot corporately assert the freedom of speech that each of its members personally may exercise. Such a doctrine would permit any arm of the state to neutralize and cancel out protected personal freedoms and liberties.

■ Part IX of the Report, exemplified by the quoted excerpts, abridges the exercise of protected expression by the plaintiffs who are members of the Kent State University faculty and other persons of the same class on whose behalf the *Adamek* plaintiffs bring their action. Imposed under the color of state law, Part IX of the Report is determined and declared to deprive these parties of rights guaranteed under the Constitution in violation of 42 U.S.C. § 1983 (1964).

■ Part IX of the Report also renders the Report illegal under the pendent state law claim. The Report unlawfully trespasses upon the doctrine of separation of powers, as that doctrine relates to the executive branch of government of which Kent State University is a part. Typical of its trespasses is attributing to those "charged with the administration of the University," the

major responsibility for the incidents occurring on the Kent State University campus on May 2nd, 3rd, and 4th * * *.

The doctrine of separation of powers is further violated when the Grand Jury, sitting as a self-appointed, albeit conscientious, board of regents, amplifies its previous judgment of blame. Part IX adds a number of the Jury's moral and social judgments, including the following:

The administration at Kent State University has fostered an attitude of laxity, over-indulgence, and permissiveness with its students and faculty to the extent that it can no longer regulate the activities of either and is particularly vulnerable to any pressure applied from radical elements within the student body or faculty.

In King v. Jones, 319 F.Supp. 653 (N.D.Ohio, November 3, 1970), Judge Ben C. Green lifted the Portage County Common Pleas Court ban on statements by Grand Jury witnesses. Afterwards, President Robert I. White of Kent State University issued a statement on the Special Grand Jury Report. In his conclusion he notes the "difficult" role of Grand Jurors and their effort to "honestly report their findings." Thus, President White accepted the mistaken assumption of the Special Grand Jury that its role included the right to make findings. He then adds:

> At the same time, we must recognize that their general report reflects a frightening misunderstanding of the role and mission of higher education.

At the trial he harked back to the Grand Jury's criticism of the administration's "permissiveness." He testified:

> I'm resisting—I would be resisting the implication that permissiveness, insofar as it related to relaxed views toward who could speak, who could assemble, who could print, what could be taught in related matters, I would have to resist any challenge to those. If that were being permissive to have such a relaxed attitude, then I shall have to continue to be permissive, and I think every university in the nation needs to be.

This reveals the restraining influence of a Grand Jury when, acting in excess of its authority as a criminal accusatory body, it makes and reports its official criticisms and judgments on the conduct of the administration of a state university that is located within the county.

Parts VIII and IX are also so intertwined with Parts I through VII that Parts VIII and IX also impair and affect the right to fair trial of the indicted persons. This additionally renders Parts VIII and IX unlawful under state law.

 It is further concluded and declared that the anti-injunction statute, 28 U.S.C. § 2283 (1948), presents no barrier to an order expunging the Special Grand Jury Report, assuming that such a remedy is otherwise justified. A grand jury report is made "under color of * * * state" law; but it is not a proceeding in a state court that may not be stayed by a federal court injunction under 28 U.S.C. § 2283 (1948). A grand jury report is as unnecessary as the human appendix. It can be as troublesome to individuals, too. It is equally true that bad faith is not a requisite of plaintiffs' claim that the Special Grand Jury Report deprives them of constitutional rights amounting to a violation of 42 U.S.C. § 1983 (1964).

### VII.

The plaintiffs contend that impairment of First Amendment rights produced by the Report, particularly by Parts VIII and IX, demonstrates that the indictments are being prosecuted in bad faith. As to the non-indicted *Adamek* plaintiffs whose First Amendment protected rights of expression have been held impaired, this has not been shown to be connected with the return of the indictments. As seen, the indictments are not a part of the Report; and it is the Report that has caused damage to the protected right of expression of the non-indicted *Adamek* plaintiffs.

None of the indicted persons testified. No evidence has been offered of any harassment of the protected right of expression of any of the indicted persons, either before or after the return of the indictments.

An attempt has been made to show that the incitement to riot indictment against Professor Thomas Lough, one of the *Adamek* plaintiffs, is being prosecuted to harass his protected right of expression. The indictment alleges that he committed this offense on May 4, 1970. It has been contended, in the complaint and during the trial, that this indictment is based principally on events which took place in Dr. Lough's classroom over five months before the May 4th shootings. However, pursuant to a request of the court, Special Counsel Balyeat particularized the indictment as

if he were answering a motion for a bill of particulars. His professional statement, accepted by the court, refutes the claim in the complaint. On the strength of the statement of Special Counsel it is concluded that the charge against Dr. Lough is limited solely to an occurrence on May 4, 1970, at some time subsequent to the shooting incident; and that the indictment of Dr. Thomas Lough is not based, as claimed, on pure speech. There is no evidence in the record that this indictment was returned to harass Professor Lough.

Throughout the trial it has been urged that defendant Attorney General Brown brought about the prosecutions of the indictment as "scapegoats" to exonerate from blame the National Guardsmen who killed and wounded students on May 4, 1970. It is argued that Attorney General Brown, acting under a conflict of interest and in bad faith, assumed the supervision of the Special Grand Jury investigation after he had already undertaken the defense of civil suits for damages for the alleged wrongful deaths of students killed by the Guardsmen. Defendants in those actions are Governor James A. Rhodes, Sylvester Del Corso, Adjutant General of the Ohio National Guard, and other National Guard officers and enlisted men. President Robert I. White of Kent State University is also a defendant. Special Counsel have been appointed by Attorney General Brown to represent the defendants.

■■■ By law the Attorney General is bound to initiate an investigation and to request a common pleas judge to convene a special grand jury when requested by the governor, Ohio Rev. Code §§ 2939.10–.11 and 109.02. Ohio Rev.Code § 109.02 specifies that the attorney general "when required by the governor * * * shall appear for the state in any court or tribunal in a cause in which the state is a party, or in which the state is directly interested." Ohio Rev.Code § 109.07 authorizes the attorney general to "appoint special counsel to represent the state in civil actions * * * in which the state is a party or directly interested."

In the several wrongful death actions brought against the governor and National Guard officers in this court, special counsel on behalf of those defendants have filed motions to dismiss, claiming as a matter of law the defense of sovereign immunity. Chief counsel of Attorney General, Robert D. Macklin professionally stated that it is the policy of his office to provide special counsel for any state officer of employee sued in his representative capacity. Appointed Special Counsel are directed to test by motion to dismiss the defense of sovereign immunity. If the motion is overruled then it is assumed that the defendant is being charged as an individual and he must secure his own counsel. As a matter of practice very often the defendant retains the previously appointed special counsel.

It is determined and declared that the Attorney General's policy, as explained by Mr. Macklin, is reasonable and lawful. The Attorney General is representing the Governor and the National Guard officers and enlisted men on the limited issue of sovereign immunity in the civil wrongful death cases. The Attorney General was bound by law to appoint special counsel for the determination of that issue. Ohio Rev.Code § 109.02 further provides that "no state officer, board, or the head of a department or institution of the state shall employ, or be represented by, other counsel or attorneys at law * * *."

The question of sovereign immunity that is being raised in the civil wrongful death actions may have been involved in the Special Grand Jury's investigation into the possible criminal responsibility of the National Guardsmen for shooting and killing the four students. Whatever possible conflict of interest thus arose does not involve bad faith. It is a result of the multiple legal duties imposed upon the Attorney General by the laws of Ohio. The appointment of different special counsel to represent the Attorney General in the civil litigation and in the

Special Grand Jury investigation provides as much insulation from any possible conflict of interest as the laws of Ohio permit.

Possible conflict of interest locked in by operation of law differs from conflict of interest as a matter of fact. Attorney General Brown denies saying publicly that he would pay for counsel if National Guardsmen were indicted. He said he "would have no authority so to do." No conflict of his interest is shown by reason of public statements made prior to the Special Grand Jury investigation. In sum, no conflict of interest of Attorney General Brown is proved, as a matter of fact. Possible conflict of interest by operation of law' was unavoidable, once the Governor requested the Attorney General to convene a special grand jury in Portage County. The Governor acted after it was determined that the State could not legally supply Portage County with the $100,000 that its county prosecutor estimated would be the cost of a county grand jury investigation.

A connected claim of bad faith arises because of the conclusion of the Special Grand Jury voiced in Part VII of the Report:

> [The National Guardsmen] are not, therefore subject to criminal prosecution under the laws of this state for any death or injury resulting therefrom.

 The exclusive power to indict or not to indict is constitutionally and historically vested in a grand jury. Selective enforcement amounting to bad faith, therefore, cannot be inferred solely from the fact that the Grand Jury has indicted 25 persons in connection with the events at Kent State University and in Kent, Ohio from May 1 through May 4, 1970; and that it did not indict any of the National Guardsmen. In Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962), the Supreme Court states that:

> [T]he conscious exercise of some selectivity in enforcement is not in

itself a federal constitutional violation.

Part VII, reasonably construed, indicates that the Special Grand Jury thereby wanted to present the most convincing findings possible to justify its finding that, acting in self-defense, the National Guard shot and killed four students and injured nine others. This legal conclusion comes first, even before the statement of facts. The content and tone of Part VII are reflected in this excerpt:

> [Seventy-four] men surrounded by several hundred hostile rioters were forced to retreat back up the hill toward Taylor Hall under a constant barrage of rocks and other flying objects, accompanied by a constant flow of obscenities and chants such as "KILL, KILL, KILL" * * *.

But not once in Part VII does the Special Grand Jury mention the killing and wounding of the students. The Report's other findings that riots occurred, that crimes were committed, and that a number of the participants in the events of May 1, through May 4, presumably including the indicted persons, are guilty of those offenses—also show strong convictions reached by the Special Grand Jury.

Yet the slant of the strongly worded convictions of the Special Grand Jury does not supply the missing proof of harassment of the protected right of expression of the indicted persons, essential to show bad faith prosecutions. There is no proof of the latter in the Report, or in the entire record. Moreover, Dombrowski, *supra*, at 390 U.S. 619–620, 88 S.Ct. 1340 as explicated in *Cameron, supra* requires establishment by clear evidence that the indictments are brought "with no expectation of obtaining convictions, knowing that [the accuseds'] conduct did not violate the statute[s]." Rather than reflecting a view that the offenses are groundless, the Report has been found to err the other way. It is filled with findings of riot, criminal conduct, and guilt.

## VIII.

Violation of 42 U.S.C. § 1983 (1964) requiring a permanent injunction against prosecution of the indictments is claimed by all plaintiffs on a further ground. Bad faith prosecutions are attributed to the concurrence of (1) the issuance of the Grand Jury Report, (2) the return of the indictments, and (3) the pretrial publicity of the Special Grand Jury Report.

The "special circumstances" of *Dombrowski, supra*, amounting to bad faith, is not part of this claim. The catalyst for federal intervention and for the requested permanent injunction against prosecution of the indictments hence is missing. *Cf.* Broyhill v. Morris, 408 F. 2d 820 (4th Cir. 1969). However, since plaintiffs so strenuously claim that these circumstances present a section 1983 claim entitling the plaintiffs to injunctive relief, irrespective of *Dombrowski*, this claim and a connected claim will be analyzed. The asserted constitutional ground is denial of the right to a fair trial.

The evidence does show that there has been wide circulation of the Special Grand Jury Report in Portage County, principally through the verbatim printing of the complete Report in the *Record-Courier*, a newspaper which serves the principal Portage County cities of Ravenna and Kent. The argument goes that the widespread dissemination of the Report in Portage County and public reaction to the Report indicate that a fair trial cannot be had in Portage County. As evidence of the reaction to the publication of the Special Grand Jury Report a follow-up news story in the *Record-Courier* on October 17, 1970, is submitted. Under a headline "Most residents agree with grand jury report," the article contains interviews with 11 residents. The quoted interviews appear to be fairly summarized in two introductory paragraphs. The lead paragraph reads:

A random sampling of Portage area residents showed most agreed with the grand jury findings that the Ohio National Guard should not be prosecuted for the early May campus disorders in Kent.

Following a paragraph that recites the return of secret indictments "against 25 persons, none Guardsmen," the third paragraph reads:

Area residents who were living in the community during the May 1–4 riots, labeled so by the grand jury, regretted the deaths of four students but emphasized the Guard's presence was the result of student rioting.

It is evident that the emphasis of the article of October 17, deals with reaction to the Special Grand Jury's finding that the Guardsmen should not be prosecuted. The persons interviewed responded to the newspaper's inquiry by speaking of "student riots," burning of building, and breaking of windows. However, these references are general and none of the persons interviewed expressed an opinion, and presumably none had any personal knowledge, as to the guilt or innocence of any of the indicted individuals. Nor could they know who was indicted since the indictments were still secret.

Assuming without deciding that the views of this small sampling of 11 residents is representative of the population of Portage County, from whose voting list will come the prospective petit jurors to be called to try the cases of the persons indicted, this is not dispositive of the claim. Should these cases eventually come to trial, time and events may have changed views. Other events may intervene to modify once held opinions. One factor that might cause prospective petit jurors to lay aside any opinion of agreement with the findings of the Special Grand Jury Report, would be the effective remedy of expungement of the Report itself.

Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) lays down the test for determining a juror's ability to be impartial and open-minded where, by reason of pretrial

publicity, the juror may have formed or expressed an opinion of guilt of the person accused. The opinion states:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

█ The petit jurors of Portage County who will be called to try these cases are presumed to be impartial and open-mindedly able to render a verdict based on the evidence and the law presented in the case. A rebuttal of that presumption can only occur, if at all, in the actual questioning of jurors on voir dire examination at the trial on the merits of each of the indicted persons.

It is urged that a basic principle of Sheppard v. Maxwell, *supra*, is pertinent. *Sheppard* stands for the principle that the probability of prejudice of jurors may be conclusively presumed under certain circumstances and need not be proved. *Sheppard*, however, is based on the court's findings as to the conduct of the trial as well as the totality of trial and pretrial publicity. The conviction of Sam Sheppard was vacated because:

> Since the state trial judge did not fulfill his duty to protect Sheppard from the inherently prejudicial publicity which saturated the community and to control disruptive influences in the courtroom, we must reverse the denial of the habeas petition. [384 U.S. at 363, 86 S.Ct. at 1522]

The application of the *Sheppard* principle of presumed prejudice of right to a fair trial is not automatic. It depends on the degree and extent of publicity that the case receives in the news media, principally at trial, United States v. Cimini, 427 F.2d 129 (6th Cir. 1970).

Plaintiffs have submitted the transcript of the dismissal of the indictments of the "Milwaukee 14" in United States v. Cotton, No. 68–CR–113 (D.C.Wis., 1969). This case was first mentioned in oral argument. Judge Myron Gordon ruled that a fair trial could not be had because of "the barrage of continuing hostile publicity which related to these defendants for the past nine months * * *." This, however, occurred not before trial but during voir dire examination of prospective jurors and only after 142 jurors had been questioned.

There is another aspect to the claim that the prosecution of the indictments is a bad faith prosecution that deprives the indicted persons of the right to a fair trial. The plaintiffs contend:

> [T]he defendants knew, or as legal officers of the State of Ohio were charged with knowing, that the proceedings before the Grand Jury and the Report issued by it and the indictments issued as part of the Report were unlawful and without legal effect and * * * were wholly unenforceable * * *.

It has been previously determined that the indictments are not a part of the Report. Though this removes the keystone of this contention, its further elements will be inspected. Attorney General Brown testified that he was firmly of the opinion that the Grand Jury did have the authority to issue a report. He conceded that the statutes "probably do not specifically authorize a detailed report such as this one," but then, he added:

> But I am also familiar with the fact that time honored and for many, many years, Grand Juries have spoken out in such matters and have issued reports which were received and published.

█ It is likely that Attorney General Brown, his Special Counsel, and probably Judge Jones also, inferred from this "time honored" custom of grand jury reports in some Ohio counties that this Special Grand Jury had authority to issue its Report. Consistent with its earlier determinations and declarations,

this court concludes that Attorney General Brown and his Special Counsel were mistaken in relying on this broad custom when the Special Grand Jury Report violates specific law in and out of Ohio. Nevertheless, this court has weighed the sincerity and candor of Attorney General Brown's testimony, the forthright statements of Special Counsel Balyeat, and the frank concessions of Special Counsel Ford. The Attorney General and his Special Counsel erred in approving, at a luncheon meeting with the foreman, the idea of issuing a Special Grand Jury Report that contemplated detailed findings; they erred in actively assisting in the drafting of the Report; and they erred in approving the release of the finished Report. However, their collective error of law was committed in a good-faith misconception of the controlling law applicable to a grand jury report of the type and content of the Special Grand Jury Report. Bad faith in the sense of deliberate willful perversion of the law to gain an improper purpose is not directly shown and it will not be inferred.

By order Judges Jones and Caris approved a press conference for October 16, 1970. The order authorized Special Counsel to their release the report of the Special Grand Jury and permitted some comment. At the press conference held on October 16th, the Report was released to some 100 reporters from the news media. It is contended that Special Counsel's conduct of this press conference, at which Special Counsel answered questions, produced and increased pretrial publicity; and that this adversely affected the right to a fair trial of those indicted by the Special Grand Jury. Considering the newsworthiness of the Report of the Special Grand Jury it is impossible to show that the judge-ordered press conference and the participation of Special Counsel in releasing the Report increased its pretrial publicity. Once Judges Jones and Caris determined to release the Report, one can be sure that alert newsmen would have given it full coverage and distribution, even if the Report had been released in some way other than a press conference.

It is urged that counsel's conduct promoted pretrial publicity of pending indictments, and that this is a violation of the "Canons of Professional Ethics." This claim is dismissed. As plaintiffs' counsel know this court has no jurisdiction to hear such a charge.

During the trial certain testimony of Attorney General Brown was permitted, but as to the claim of bad faith of the Attorney General, the court reserved "final ruling until it is clearly and definitely linked up with what this Grand Jury did." The record does not establish that anything that the Attorney General or his Special Counsel said or did constitutes bad faith. Nor does it show that their actions "caused or produced the indictments."

After considering all aspects of the claim of bad faith prosecution of the indictments amounting to a deprivation of the right to fair trial, it is determined and declared, on this record and at this pretrial stage of the state prosecutions, that a deprivation of the right to a fair trial has not been shown. Moreover, other than the continued official existence of the Report, there is no showing of facts that clearly prove an irreparable and immediate injury to the right to a fair trial. The first essential to the requested injunction against the Portage County Common Pleas Court prosecutions of the indictment is not established. On this record, furthermore, it is determined and declared that at this pretrial stage of these state court prosecutions, insofar as the section 1983 claim of the plaintiffs is based on the claim that bad faith prosecutions deprive them of the right to a fair trial, by reason of 28 U.S.C. § 2283 this court lacks jurisdiction to stay these state court prosecutions.

IX.

The determinations and declarations that have already been made in the course of this long opinion at least serve

to shorten the concluding paragraphs relating to relief warranted on this record. The request for a permanent injunction against the prosecution of the 30 indictments is denied. The request for an order directing the minutes of the Special Grand Jury to be open for inspection is denied. *Cf.* Silverthorne v. United States, 400 F.2d 627, 633, 634 (9th Cir. 1968).

For the foregoing reasons and upon the grounds previously stated, it is determined and declared that though it purports to be an official and lawful report properly filed on October 16, 1970, and accepted and approved by the court and legally journalized as a document of the Portage County Common Pleas Court, the Report of the Special Grand Jury was issued illegally and wholly without lawful authority. It continues illegally in effect in the records and on the journals of the Common Pleas Court. The Report irreparably injures, and as long as it remains in effect, the Report will continue to irreparably injure, as particularized, the rights of the indicted plaintiffs and of other persons similarly situated on whose behalf this action is brought. A rooting out of the Report from the files and records of the Portage County Common Pleas Court is required. No greater relief is warranted. No less remedy will suffice.

 Thought has been given to a possible order that would give the Common Pleas Court of Portage County an opportunity to take remedial action consistent with the findings, determinations, and declarations reached in this opinion. However, it is concluded that this approach would in effect ask that court of coordinate jurisdiction to carry out the orders of this court. It would also ask that court to carry out orders that are inconsistent with the belief and opinion of Judge Jones, manifest on this record, that the Special Grand Jury Report is a valid and proper document.

Affirmative action to expunge the Report is justified on another ground. In King v. Jones, *supra*, Judge Green's opinion recites that:

> In his testimony, Judge Jones stated that the primary consideration in the issuance of the order [the ban of September 5, 1970] was the obligation which he and Judge Caris believed the *Sheppard* ruling imposed upon the state court to protect the matter before the Special Grand Jury from improper disclosure, and to protect the rights of those persons who might be indicted by the Special Grand Jury.

Judge Jones testified in federal court before Judge Green in early November 1970. He then recognized his duty "to protect the rights of those persons who [have been] indicted by the Special Grand Jury." Nevertheless, since then Judges Jones and Caris have not expunged the Special Grand Jury Report. The imperative need to expunge the Report to implement the duty Judge Jones recognizes under *Sheppard* is evident. The absence of any order of expungement of the Special Grand Jury Report by Judges Jones and Caris indicates that they still regard the issuance of the Report as lawful; and they do not regard its continued force and effect in the records and on the journals of the Common Pleas Court of Portage County as violative of their duty under *Sheppard* to protect the rights to a fair trial of those indicted by the Special Grand Jury.

Under these circumstances, and upon the entire record, it is therefore concluded that it is unlikely that the Portage County Common Pleas Court would provide the plaintiffs the necessary remedy of total and adequately publicized expungement of the Report of the Special Grand Jury from its files and records. A basis for abstention of this court is absent. The need for federal intervention is plain and persuasive. Therefore, this court enters the following order.

## ORDER

The foregoing opinion, pursuant to Rule 52, Federal Rules of Civil Procedure shall constitute findings of fact and con-

clusions of law. In accordance with this opinion and said findings of fact and conclusions of law, it is ordered:

1. Each of the declarations herein made shall be ordered into effect.

2. Defendant Clerk of Courts of Portage County, Lucy S. DeLeone, is ordered as follows:

a. With reference to any copies of the Special Grand Jury document (Plaintiff Hammond's Exhibit 1) that exist in the files or records (pending or closed) of the Common Pleas Court of Portage County, defendant DeLeone shall separate and retain Entry on Special Grand Jury, pages 1, 2, and 3 together with that upper portion of page 4 that includes the caption and the first two narrative paragraphs through the 16th line of typing. The remainder of any Report of the Special Grand Jury (balance of page 4 and pages 5 through 18) shall be physically expunged and destroyed.

b. With reference to the journalization of said Special Grand Jury document, Court Journal 113, page 374, containing ENTRY ON SPECIAL GRAND JURY shall be preserved and retained; Court Journal 113, pages 375 through 389, containing Report of the Special Grand Jury shall be obliterated or physically removed and destroyed, except the upper portion of Journal 113, page 375 which includes the caption and first two paragraphs through the 16th line of typing.

c. Not later than ten (10) days from the date of filing of this order the said Lucy S. DeLeone shall comply with this order; and defendant Lucy S. DeLeone shall immediately thereafter report compliance to this court in a certificate of compliance that shall be entered on the docket of these cases and on the microfilm record of this court.

d. Defendant DeLeone shall cause to be published in the *Record-Courier* each day for a six-day period, commencing immediately after the defendant certifies to this court that she has complied with the orders of this court, a copy of this court's order together with defendant DeLeone's certificate of compliance.

3. The defendant Attorney General of Ohio is directed to pay for publication of the newspaper notice. Further, the costs of these proceedings shall be taxed against the defendant Attorney General of Ohio.

It is so ordered.