Arthur KRAUSE, et al.,
Plaintiffs-Appellees,

v.

James A. RHODES, et al., Defendants,

Attorney General of Ohio, for The Ohio Highway Patrol, Bureau of Criminal Investigation and Ohio National Guard, Intervenors-Appellants,

and

Kent State University, Appellant.

Nos. 79–3640, 79–3642.

United States Court of Appeals,
Sixth Circuit.

Argued June 10, 1981.

Decided Feb. 18, 1982.

William J. Brown, Atty. Gen. of Ohio, Burton Fulton (argued), Virginia L. Reichard (on brief), Cleveland, Ohio, for the Ohio Highway Patrol, Bureau of Criminal Investigation and Ohio National Guard, Intervenors-Appellants in No. 79–3640.

John R. Climaco and Shimon Kaplan (on brief), Climaco, Goldberg, Boukalik & Seminatore Co., L.P.A., Cleveland, Ohio, for appellant, Kent State University in No. 79–3642.

Ellen S. Goldblatt (on brief), Landels, Ripley & Diamond, San Francisco, Cal., Rees Davis, Mansfield, Ohio, Nelson Karl, Cleveland, Ohio, David Engdahl, Engdahl, Renzo & Reed, P. C., Denver, Colo., Nicholas B. Waranoff, Jacobs, Sills & Coblentz, San Francisco, Cal., Robert S. Baker, Fayetteville, W. Va., Steven R. Keller, Columbus, Ohio, Sanford Jay Rosen (on brief and

argued), Rosen & Remcho, San Francisco, Cal., for appellees.

Chester E. Finn (on brief), Charles H. Horn (on brief and argued), Estabrook, Finn & McKee, Dayton, Ohio, for amicus curiae Dayton Daily News.

Before EDWARDS, Chief Judge, LIVELY, Circuit Judge, and PHILLIPS, Senior Circuit Judge.

EDWARDS, Chief Judge.

In these cases we deal with appeals from certain public disclosure orders entered by then U.S. District Judge William Thomas [1] in the Northern District of Ohio in the aftermath of the tragic events of May 4, 1970 on the campus of Kent State University. The civil damage actions filed by the injured and the survivors of those killed by the Ohio National Guard during the riotous events of that week have now been settled. See Krause v. Rhodes, 640 F.2d 214 (6th Cir. 1981).[2] But the interest of some of the parties, some historians and the news media continues unabated and has produced this litigation.

The Attorney General of Ohio has filed a careful and accurate statement of facts which supply the background of this appeal.

In deciding this appeal, This Court must remember the tumultuous, turbulent decade of the 1960's. The war in Southeast Asia, general social discontent and violent protests, particularly on campuses, focused national attention on the demonstrations at Kent State University in the Spring of 1970. The demonstrations attracted many nonstudents to the campus in Kent, Ohio. Included were university and non-university youths, curious adults, members of the media, law enforcement personnel plus members of various state, federal and local governmental agencies.

Following the May 4 tragedy, an immediate, intensive investigation began. Agencies involved included the Ohio State Highway Patrol, the BCI, the State Arson Department, the City of Kent Police Department, the Kent State University Police Department, the Ohio National Guard, the Federal Bureau of Investigation and the Department of Justice.

This background of events greatly affects the issue presented on appeal. The events of May 4, 1970 and the resulting litigation were both explosive and unique. While perhaps the passage of time has softened the emotional outcry regarding the unfortunate events of May 4, 1970, any judicial decision relating to those events uniformly receives media dissemination. By reason of this, a decision governing the public dissemination of Kent State discovery materials has important precedential value not only from a technical legal point of view, but as a future guideline governing the ability of governmental agencies to conduct critical investigative functions.

The documents now required to be publicly disseminated were produced by law enforcement agencies as a result of their interviews with countless witnesses to the events. The investigation required that all informational possibilities be explored.

The very nature of the documents which include hearsay, speculation and irrelevancies points to the wide range of questioning enlisted by various investigative agencies as well as the wide range of the stories elicited from witnesses.

---

1. Judge Thomas took senior status on February 15, 1981.

2. The complete history of these events and their aftermath is written in the following cases: Krause v. Rhodes, 471 F.2d 430 (6th Cir. 1972), rev'd sub nom Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), appeal after remand, 570 F.2d 563 (6th Cir. 1977), cert. denied, 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 517 (1978); C.B.S., Inc. v. Young, 522 F.2d 234 (6th Cir. 1975); Krause v. Rhodes, 390 F.Supp. 1072 (N.D.Ohio 1975); Krause v. Rhodes, 390 F.Supp. 1070 (N.D.Ohio 1974); United States v. Shafer, 384 F.Supp. 496 (N.D. Ohio 1974); Hammond v. Brown, 323 F.Supp. 326 (N.D.Ohio), aff'd, 450 F.2d 480 (6th Cir. 1971); Krause v. State, 31 Ohio St.2d 132, 285 N.E.2d 736, appeal dismissed, 409 U.S. 1052, 93 S.Ct. 557, 34 L.Ed.2d 506 (1972), reh. denied, 410 U.S. 918, 93 S.Ct. 959, 35 L.Ed.2d 280 (1973).

The extensive investigations conducted at Kent State by the many agencies involved resulted in volumes of material, much of which proved to be unrelated to the issues which were litigated. The abundant fruits of liberal discovery is in sharp contrast with the limited number of documents relied upon in the various civil and criminal suits.

### Background of Discovery Rulings
### First Civil Trial

The unique circumstances under which discovery was conducted in the civil suits gives rise to serious policy considerations in regard to the public dissemination of materials obtained through discovery.

Judge Don Young consistently held that the discovery was to be open, broad and far-reaching. At no time, however, did he suggest public dissemination of the material. Reacting to various discovery requests and motions for protective orders in response thereto, Judge Young struck a balance between the litigant's need for the requested information and the possibility of harm or injustice to the others. For example, discovery was permitted, but a contemporaneous protective order was imposed by Court orders entered in 1974 and 1975 sealing certain depositions (App. pp. 45–46, 51–52).

The District Court held that all information which might prove relevant would be subject to discovery. Thus, documents and reports which were entitled to a claim of privilege were ordered to be produced. See the Court's orders of February 13, 1975 (App. pp. 65–66) and March 25, 1975 (App. pp. 70–72) in which motions to quash subpoenas duces tecum filed on behalf of the State agencies and the university were denied.

In this spirit of complete discovery, Judge Don Young on May 16, 1975, ordered that plaintiff be granted access to a transcript of the testimony of all witnesses appearing before the Federal Grand Jury which returned the indictments in *United States v. Shafer, supra* (App. pp. 82–83).

The Court's philosophy was articulated during litigation. In a Memorandum filed February 20, 1975, Judge Young stated:

"At the outset, it ought to be understood that this Court is a firm adherent to the concept of 'open file' discovery. The Federal Rules of Civil Procedure are based upon the idea that a trial is a search for truth, not a game or a battle of wits. Some four decades of practical experience have convinced this Court that the need for trial frequently disappears once both sides have a full and complete understanding of the facts. . . . In the heavy fog of emotion which engulfs [this case], seeing objectively what really happened will be difficult at best. No scrap of information available to anyone involved should be held back until the time of trial." (As repeated by the Court in its March 25, 1975 order; App. pp. 70–71.)

The Court was aware that while large volumes of material would be produced, only a small portion of that material ultimately would be relevant. Judge Young stated:

"In order to sort the wheat from the chaff in this case, many bushels of hearsay and opinion will have to be winnowed in order to produce a few grains of admissible evidence." *Krause v. Rhodes* (N.D.Ohio, 1975), 390 F.Supp. 1072, 1074.

In March, 1975, the Court added:

"Already in this case the Ohio National Guard, the Ohio State Highway Patrol, the Justice Department and the Federal Bureau of Investigation *have opened their files* in order to assure that both sides are in possession of all facts, thus expediting the search for the truth . . . It is important that no fact, however ostensibly unimportant or irrelevant, which pertains to the events surrounding this case be withheld." (Emphasis added; App. pp. 70–71.)

The purpose of discovery was fulfilled through the Court's "open file" approach. The various state and federal agencies had "opened their files." No scrap of information, however unimportant or irrelevant, was withheld. Plaintiffs-Cross Appellants had access to *all* information from the files of various agencies prior to trial. The par-

ties to the civil litigation were free to use whatever information they chose in preparation for their case and to offer at trial whatever documents and exhibits they deemed relevant.

Motion to quash and for protective orders were promptly filed by agencies whose documents were the subject of discovery. In early 1975, counsel for Kent State University in behalf of certain witnesses objected to the depositions and voiced their concern that the discovery be used by plaintiffs' counsel solely in preparation for their case. The Court on April 24, 1975 granted the witnesses leave to file a motion for protective order (App. pp. 75–77).

A hearing on that Motion was held on August 20, 1975. Plaintiffs' counsel argued that no limitation be placed upon the discovery documents in order to best serve "future journalists and historians" (App. pp. 109–117). The die had been cast regarding the desire of certain parties to insist on public dissemination of all discovery materials.

The District Court granted the Motion on behalf of the witnesses and instructed counsel to prepare a protective order broad enough to encompass all parties stating:

"I have read that motion and the memorandum in support of it, and I feel that that is a motion that in fairness not only to these particular witnesses who filed the motion, but the ruling ought to be broad enough to apply to all the parties to this litigation, that what is on the record, what was in evidence here in Court or even what was offered in evidence here in Court and was excluded, I think is properly in the public domain, but *I made very broad orders of discovery* and, of course, even in the absence of the broad order of discovery, the rules of discovery are extremely broad and they permit counsel on discovery far-ranging exploration, and to force the production of lots of material and to ask lots of questions and compel lots of answers to them.

I think that those matters on discovery are the property, perhaps, of the parties and their counsel, but only for the purposes of the case, and that *beyond the purposes of the case I don't think that those belong to anybody except the persons that their materials were produced, they are the materials of the people that produced them.*" (Emphasis added; App. pp. 110–111.)

Following the first trial, the District Court on September 15, 1976 overruled a motion to vacate the protective order which was filed by plaintiffs' counsel (App. pp. 95–97).

Background of Rulings Second Civil Trial

The second civil trial began in December, 1978 before Judge William K. Thomas. The matter was finally concluded in early 1979, the Court reserving jurisdiction to consider certain matters.

Reacting to Plaintiffs' Renewed Motion to Amend and Vacate Protective Order, District Judge William K. Thomas on February 28, 1979 concluded that the protective order of June 24, 1976 should not be extended beyond the termination of the litigation. Rather, each category of discovery materials was to be considered individually and a new protective order fashioned. The Court's rulings of February 28, 1979 and March 12, 1979 are the subject of this appeal (App. pp. 270–305, 309–315).

The Attorney General's brief also makes a reasonable statement of the legal issue as Ohio sees it.

Following the second Kent State civil trial, Judge William K. Thomas, in his March 12, 1979 Order directed that counsel should return to the United States Attorney all copies of the Federal Grand Jury testimony produced in *United States v. Shafer, supra.* The Court ordered that all copies of testimony given before the Portage County Special Grand Jury that investigated the Kent State incident be returned to the Clerk of Courts of Portage County; and further ordered the return of all 201 (Personnel) Files of defendant Guardsmen to the Ohio National Guard.

Appellants do not take issue with these portions of the Court's Order and urge for the reasons set forth in the Opinion of Judge William K. Thomas that his Order dealing with Federal and State Grand Jury testimony as well as 201 Files be affirmed.

Appellants do maintain that the District Court's Order unconditionally releasing to the public domain discovery materials produced by the BCI, the Ohio State Highway Patrol and the Ohio National Guard should be reversed and an order entered directing all counsel and parties to return to the respective State agencies all copies of reports, statements, memoranda and investigative material which were obtained through the discovery process but which were not admitted into evidence and made part of the record in either civil trial.

Plaintiffs' brief provides a few more background facts in a succinct statement of the case:

## STATEMENT OF THE CASE

This consolidated appeal is brought by Kent State University, the Ohio Bureau of Criminal Identification (BCI), the Ohio State Highway Patrol and the Ohio National Guard (collectively the appellants) from an Order of the United States District Court for the Northern District of Ohio, Eastern Division (Thomas, J.) on March 12, 1979 in Case No. C70–544. That Order vacated the June 24, 1976 Protective Order of the Court (Young, J.) which barred the public dissemination of documents acquired through discovery by the parties in the underlying Kent State civil cases and all deposition testimony, which had not become part of the official record of the case, except with the written permission of the person testifying [or] the organization producing the documents.

The Order of March 12, 1979 was carefully drafted by the District Court after it considered the interest of all parties and entities involved. Indeed, before entering its Order, the District Court conducted evidentiary and other proceedings in open court on parts of six days,[1] conducted its own investigation, considered numerous affidavits and other exhibits, and explained its actions in a careful Memorandum and Order.

[1] The Transcripts of these six days of proceedings are found in Volume 2 of the Appendix: January 9 (pp. 361–98); January 15 (pp. 399–464); January 17 (pp. 456–599); January 18 (pp. 600–736); February 6 (pp. 737–772) and March 9 (pp. 773–817).

The March 12, 1979 Order permits the dissemination of the majority of the discovery materials, though requiring in many instances, redaction from the documents of the names and witnesses, interviewing officers and third parties. The inherent reasonableness of the court's approach essentially was recognized by the U.S. Justice Department, whose "investigative" materials FBI "302" Statements are covered by the Order. Unlike the appellants, the United States has determined not to appeal the District Court's Order. (See e.g., App. Vol. 2 p. 775.)

The appellants are not satisfied by the protection afforded by redaction and seek the return of all documents and materials to the originating agencies where they would be stored—and shut away from the public view—or perhaps destroyed. The plaintiffs in the underlying action, their attorneys, their legal workers and Peter Davies (collectively appellees) seek to keep these materials in the public domain where they reposed until the entry of the June 24, 1976 Protective Order which was vacated on March 12, 1979.

It is clear to us that Judge Thomas has proceeded in this case with complete awareness of the conflicting rights of the opposing parties. He has sought with extraordinary industry to examine the massive records involved here, to protect state and federal grand jury secrecy provisions, to protect legitimate law enforcement interests, and to protect the privacy rights of individuals. In this regard, he has returned all copies of the federal grand jury testimony to the U.S. Attorney. No appeal was taken from this order. He has also ordered

that all copies of the Portage County special grand jury testimony be returned to the Clerk of the Courts for Portage County Common Pleas Court. No appeal has been taken from this order. He has ordered returned to the National Guard of Ohio all of the personnel files of the defendant guardsmen. No appeal has been taken from this order.

As to the balance of the materials which had been open to plaintiffs for discovery purposes as a result of the original trial judge's open-file policy, he has ordered public disclosure because of First Amendment interests and the historic nature of the events portrayed in the materials concerned. He has, however, ordered redaction of all names of witnesses supplying statements to protect their individual privacy rights. He has also conducted repeated hearings to allow motions on behalf of any whose interest might be offended to allow them to show that the statements or depositions might, even as redacted, nonetheless violate privacy rights or "be used to gratify private spite or promote public scandal." No appeals have been taken from the redaction orders or the specific protective orders entered by the District Judge. Defendants-appellants and Intervenor-appellants do appeal his release of the balance of the mass of documents, statements, investigative reports and depositions after such deletions.

We now affirm the various orders involved in these appeals. They are the following:

(6) Plaintiffs' counsel shall turn over for redaction (deletion of names of witnesses, interviewing officers, and third parties):

    \*    \*    \*    \*    \*    \*

(b) To the Ohio National Guard and the Ohio Highway Patrol, all copies of witness statements and witness interview reports obtained from those agencies;

(c) To the Ohio Bureau of Criminal Identification and Investigation (BCI), all copies of witness statements obtained from that agency.

(d) To the Kent State University Police Department (KSU PD), all copies of witness statements, interview reports and advice of rights acknowledgments (except those relating to the Norman incident) obtained from that agency, and all copies of a statement entitled "To Whom It May Concern." After redaction, each individual or agency listed above shall return to plaintiffs' counsel the reports, statements and acknowledgments.

    \*    \*    \*    \*    \*    \*

(8) The foregoing redaction orders shall not be required with reference to statements of, interview reports of, or acknowledgments by witnesses who later testified at trial.

    \*    \*    \*    \*    \*    \*

(10) The remaining Ohio National Guard and Ohio Highway Patrol discovery materials are unconditionally released to counsel.

(11) All the remaining BCI discovery materials are unconditionally released to counsel.

    \*    \*    \*    \*    \*    \*

(13) All the remaining KSU PD discovery materials are unconditionally released to counsel. (App. Vol. 1, pp. 312–314)

We recognize that we deal here with substantial issues involving emanations from the First Amendment such as the public's right to know and legitimate concern about the accurate recordation of important historical events. We also recognize the potential conflict of these principles in this case with legitimate privacy rights of many individuals and the appropriate institutional concerns of the state and law enforcement agencies herewith involved. Our task would be far more monumental, however, if in deciding this case we were not completely convinced that Judge Thomas had sought with all the industry that a judge can bring to bear to reconcile these important interests as nearly as may be. It seems clear to us that the District Judge followed the principles involved in several cases dealing with the conflict between the First Amend-

ment and individual rights of privacy. *United States v. Mitchell,* 551 F.2d 1252, 1258 (D.C.Cir.1976), *rev'd on other grounds sub nom Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *In re Halkin,* 598 F.2d 176 (D.C.Cir.1979).

In *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597–99, 98 S.Ct. 1306, 1311–1312, 55 L.Ed.2d 570 (1978), Justice Powell, writing for the Court, reviewed the law applicable to the sorts of problems which Judge Thomas had before him:

It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents. In contrast to the English practice, see, *e.g., Browne v. Cumming,* 10 B. & C. 70, 109 Eng.Rep. 377 (K.B.1829), American decisions generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit. The interest necessary to support the issuance of a writ compelling access has been found, for example, in the citizen's desire to keep a watchful eye on the workings of public agencies, see, *e.g., State ex rel. Colscott v. King,* 154 Ind. 621, 621–627, 57 N.E. 535, 536–538 (1900); *State ex rel. Ferry v. Williams,* 41 N.J.L. 332, 336–339 (1879), and in a newspaper publisher's intention to publish information concerning the operation of government, see, *e.g., State ex rel. Youmans v. Owens,* 28 Wis.2d 672, 677, 137 N.W.2d 470, 472 (1965), modified on other grounds, 28 Wis.2d 685a, 139 N.W.2d 241 (1966). But see *Burton v. Reynolds,* 110 Mich. 354, 68 N.W. 217 (1896).

It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. For example, the common-law right of inspection has bowed before the power of a court to insure that its records are not "used to gratify private spite or promote public scandal" through the publication of "the painful and sometimes disgusting details of a divorce case." *In re Caswell,* 18 R.I. 835, 836, 29 A. 259 (1893). Accord, *e.g., C. v. C.,* 320 A.2d 717, 723, 727 (Del.1974). See also *King v. King,* 25 Wyo. 275, 168 P. 730 (1917). Similarly, courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption, *Park v. Detroit Free Press Co.,* 72 Mich. 560, 568, 40 N.W. 731, 734–735 (1888); see *Cowley v. Pulsifer,* 137 Mass. 392, 395 (1884) (per Holmes, J.); *Munzer v. Blaisdell,* 268 App.Div. 9, 11, 48 N.Y.S.2d 355, 356 (1944); see also *Sanford v. Boston Herald-Traveler Corp.,* 318 Mass. 156, 158, 61 N.E.2d 5, 6 (1945), or as sources of business information that might harm a litigant's competitive standing, see, *e.g., Schmedding v. May,* 85 Mich. 1, 5–6, 48 N.W. 201, 202 (1891); *Flexmir, Inc. v. Herman,* 40 A.2d 799, 800 (N.J.Ch.1945).

It is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate. The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case. In any event, we need not undertake to delineate precisely the contours of the common-law right, as we assume, *arguendo,* that it applies to the tapes at issue here. (Footnotes omitted).

While *Nixon v. Warner Communications* was decided on a totally different basis from any available to Judge Thomas or this court in this case, we note specifically that Judge Thomas made provisions in his handling of this case to accord with the principles of law just set forth above. As we have already pointed out, he acted carefully to prevent the records which were being

sought before him from being "used to gratify private spite or promote public scandal." *Id.* 435 U.S. at 598, 98 S.Ct. at 1312.

We also base our holding in this case upon the proposition just quoted above that "the decision as to access is one best left to the sound discretion of the trial court."

Judge Thomas also depended upon *In re Halkin, supra* at 191–92, where Chief Judge Bazelon, for a unanimous panel of the D.C. Circuit, held First Amendment rights attached to materials made available through the discovery process. In analyzing First Amendment interests as against privacy rights, Judge Bazelon said:

> The court must then evaluate such a restriction on three criteria: the harm posed by dissemination must be substantial and serious;[34] the restraining order must be narrowly drawn and precise;[35] and there must be no alternative means of protecting the public interest which intrudes less directly on expression.[36]

[34] *See Landmark Communications, Inc. v. Virginia,* 435 U.S. [829] at 844–45, 98 S.Ct. 1535; [at 1544, 56 L.Ed.2d 1] *Wood v. Georgia,* 370 U.S. [375] at 384–85, 82 S.Ct. 1364; [at 1369–1370, 8 L.Ed.2d 569] *Bridges v. California,* 314 U.S. [252] at 262–63, 62 S.Ct. 190; [at 193 194, 8 L.Ed.2d 569] *Chicago Council of Lawyers v. Bauer,* 522 F.2d [242] at 249; *cf. Nebraska Press Ass'n, v. Stuart,* 427 U.S. [539] at 562, 96 S.Ct. 2791 [at 2804, 49 L.Ed.2d 683].

[35] "An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pinpointed objective permitted by the constitutional mandate . . . ." *Carroll v. President and Commissioners of Princess Anne,* 393 U.S. [175] at 183, 89 S.Ct. [347] at 353 [21 L.Ed.2d 325]. *See also Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800 [1811], 40 L.Ed.2d 224 (1974).

[36] *Nebraska Press Ass'n,* 427 U.S. at 563, 96 S.Ct. 2791 [at 2804]; *Carroll,* 393 U.S. at 183–84, 89 S.Ct. 347 [at 353]; *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247 [252], 5 L.Ed.2d 231 (1960).

In assessing the propriety of a protective order in each case (*i.e.,* whether there is "good cause" for an order which restricts expression), the trial court must consider and make the necessary findings on each element of the standard.

We have already pointed out above how carefully Judge Thomas sought to follow these principles. We should point out, however, that *Halkin* presented the D.C. Court with a considerably more difficult problem than we face here. *Halkin* involved a pretrial protective order, whereas here the lengthy litigation of the Kent State cases had finally come to a total settlement before Judge Thomas' post-trial orders were entered.

Finally, we conclude that Judge Thomas most certainly did not abuse his discretion. On the contrary, his orders were drafted with careful recognition of the competing interests, and he scrupulously followed the applicable law.

The judgment of the District Court is affirmed.