**OMEGA HOMES, INC., Plaintiff,**

v.

**CITICORP ACCEPTANCE CO., et al., Defendants.**

**Civ. A. No. 82–0718(R).**

United States District Court,
W.D. Virginia,
Roanoke Division.

March 10, 1987.

Douglas D. Wilson, Parvin & Wilson, Roanoke, Va., for plaintiff.

William J. Creech, Jr., William R. Rakes, Gentry, Locke, Rakes & Moore, Roanoke, Va., Gerald A. Novack, Barrett, Smith, Shapiro, Simon & Armstrong, New York City, for defendants.

## MEMORANDUM OPINION

TURK, Chief Judge.

This case comes before the court on the motions of the plaintiff and the defendants. Defendant Citicorp moves to Quash Service, or in the Alternative to Dismiss on the ground that the court lacks *in personam* jurisdiction over it. All of the defendants move to dismiss Count VI of the complaint for lack of standing. The plaintiff moves to modify the stipulated protective order entered by the court on June 29, 1983. For the reasons stated below, the court will grant the defendants' motions and deny the plaintiff's motion.

## PARTIES

The plaintiff Omega Homes ("Omega") is a retailer of mobile homes and related goods and services and is located principally in Blacksburg, Virginia.

Defendants Citicorp Acceptance Corp. ("CAC") and Citicorp Homeowners, Inc. ("CHI") are Delaware Corporations with their principal places of business in St. Louis, Missouri. CAC and CHI are wholly owned subsidiaries of defendant Citicorp. CAC is the successor in interest to CHI. The fourth defendant, Advance Mortgage Corp. ("Advance") was a subsidiary of Citicorp during the times relevant to this suit. It is a Delaware Corporation and it too was a predecessor in interest to CAC.

Defendant Citicorp is a bank holding company that is a Delaware Corporation with its principal place of business in New York City. Citicorp, except for its ownership interest, does not actively participate in its subsidiaries' daily affairs. Omega, however, has submitted proof that Citicorp is not a completely silent participant in the subsidiaries' affairs. The proof consists of Federal Reserve Board Opinions, applications submitted by Citicorp to the Federal

Reserve Board pursuant to Section 4(c)(8) of the Bank Holding Company Act, 12 U.S.C. § 1843(c), and an affidavit submitted by Omega's attorney, Carl Tibbets.

The documents indicate that Citicorp determined the operating locations of its subsidiaries, infused large amounts of capital into the subsidiaries and provided the subsidiaries with management expertise and resources.

## BACKGROUND

### a. The Defendants' Actions

Omega began in 1974 as a retailer of mobile homes and an authorized insurance agent. In November 1974, in connection with its mobile home sales, it also began offering mobile home financing that originated with Advance, and later with CHI and CAC. The amended complaint documents the complex relationships between the parties and the multi-faceted economic arrangements that are the subject of this suit. Omega alleges that the defendants breached various agreements and duties owed to it and that they violated the Federal antitrust and banking laws. Defendants' motions concern only the antitrust and banking law claims and the facts relevant to those motions can be briefly summarized.

Omega's position as an outlet for homes, insurance, and financing reflects standard practice in the mobile home industry. In all mobile home sales, the financing of the purchase is conditioned on the buyer's obtaining repossession, alteration, collision, and conversion insurance. Further, the financer invariably requires the buyer to carry physical damage insurance, payable to the financer, to protect the financer's security interest in the home. Dealers like Omega enable mobile home consumers to obtain their home, their insurance, and their financing at one location. The monthly fees for the mortgage and insurance are usually consolidated into one payment to the dealer. Like other insurance agents, a mobile home dealer like Omega receives a commission for all the insurance it sells.

While the term of a mobile home mortgage typically ranges from ten to fifteen years, the term of a mobile home insurance contract runs from 2 to 3 years. Thus a mobile home purchaser must renew his insurance several times during his relationship with the broker. At the end of each insurance period, the consumer has the option of obtaining insurance with another company or of renewing its existing policy. Most often, the consumer does not obtain other insurance and the existing policy is automatically renewed or "force-placed." The commission for a force-placed policy is rewarded to the broker of the original insurance.

The defendants, however, use a different practice concerning renewal policies. CHI, for example, itself acts as a broker for several insurance companies. When a consumer of CHI financing has an insurance policy up for renewal, it must purchase the new policy directly through CHI, bypassing Omega, the original retail broker. Omega receives no commission on renewal policies sold through CHI's brokerage. Since the defendants began acting as their own insurance broker, Omega has lost the revenues it once received from its own brokerage business.

To further its position as insurance brokers, CHI has entered numerous agreements with insurance companies covering licensing fees and the sharing of information, such as mailing lists, about its mobile home finance customers. The defendants have also set up several new corporations to handle mobile home insurance, including an offshore brokerage in Bermuda.

According to Omega, the defendants have created a tying arrangement by requiring the consumers of their mobile home financing to obtain insurance exclusively through them, and by creating an institutional base to support its insurance brokerage affairs. Omega alleges that such a scheme violates the antitying restrictions of the antitrust laws and the banking laws.

### b. The Protective Order

On June 29, 1983 the court entered a stipulated protective order that was sub-

mitted with the approval of the parties. The order was intended to ensure the confidentially of all discovery material in this case and ordered that discovered information "shall be utilized only in connection with this civil action." The order also reserved any party's right to apply for modification. Omega has moved to modify the order to remove the restriction on using the material only for this suit. Omega alerts the court to five similar federal lawsuits against CHI in other districts and argues that a relaxation of the prior order would save those litigants the time and expense of duplicative discovery.

*I. Motion of Citicorp to Quash Service or in the Alternative to Dismiss*

Omega asserts that there are two jurisdictional bases that justify Citicorp's presence in this suit: the Clayton Act venue provisions for antitrust suits, 15 U.S.C. § 22, and Virginia's Long Arm Statute, *Va. Code* § 8.01–328.1A (1950). Citicorp denies that jurisdiction exists under these laws because it is merely a silent, non-participating parent with no role in the day to day affairs of its subsidiaries. Citicorp contends that its relationship with CAC and CHI is too attenuated to make it liable for torts arising from the subsidiaries' regular course of business.

The court notes that to consider the motion to dismiss for lack of personal jurisdiction it considers as true all the allegations in the complaint. *Barton v. Eustis*, 415 F.Supp. 1355 (S.D.Fla.1976).

*a. Jurisdiction Under the Clayton Act*

Section 12 of the Clayton Act provides that:

> Any suit, action, or proceeding under the antitrust law against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. In construing this jurisdiction/venue rule, the Supreme Court provides a broader scope over non-resident corporations in antitrust cases than it does in other cases. *United States v. Scophony Corporation of America*, 333 U.S. 795, 807–08, 68 S.Ct. 855, 861–62, 92 L.Ed. 1091 (1948). Indeed, the statutory terms "inhabitant," "wherein it (the corporation) may be found" and "transacts business" create three possible sources of antitrust venue for any one defendant.

It is relatively simple for a court to see if a defendant meets either of the first two standards. "Inhabitant" places venue in the corporation's state of incorporation. *Aro Manufacturing Co. v. Automobile Body Research Corp.*, 352 F.2d 400 (1st Cir.1965), *cert. denied*, 383 U.S. 947, 86 S.Ct. 1199, 16 L.Ed.2d 210 (1966). Being "found within a district" connotes a corporations' presence in the district by way of its officers and agents carrying on corporate business within the district. *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 371–73, 47 S.Ct. 400, 402–03, 71 L.Ed. 684 (1927) (construing identical language of § 7 of the Sherman Act).

Citicorp is incorporated in Delaware. It has no office or other place of business in Virginia. It holds no assets here nor does it pay any taxes in Virginia. It is clear, therefore, that Citicorp is neither an inhabitant of nor found in this district. Consequently, to prove jurisdiction over Citicorp, Omega must rely on the third requirement and show that Citicorp transacts business in the Western District of Virginia. *See King v. Johnson, Wax Assoc. Inc.*, 565 F.Supp. 711 (D.Md.1983).

Unlike the other two section 12 standards that a court can conclusively determine with a simple examination of a corporation's basic structure, the requirement that a corporation must "transact business" within a certain district requires a court's more searching examination of the particular facts of each case and of the unique elements of the defendant corporation's operation. *Scophony*, 333 U.S. at 807, 810, 68 S.Ct. at 861, 863; *Grappone v. Subaru of America, Inc.*, 403 F.Supp. 123, 128 (D.N.H.1975).

To determine whether a certain corporation transacts business within a judicial district generally a court should examine a corporation's specific dealings, activities and connections within a district. *National Constructors v. National Electrical Contractors*, 498 F.Supp. 510, 525 (D.Md.1980), *modified*, 678 F.2d 492 (4th Cir.1982), *cert. dismissed*, 463 U.S. 1233, 104 S.Ct. 26, 77 L.Ed.2d 1449 (1983). When the defendant is a parent corporation accused of the antitrust violations committed by its subsidiary, then the court's analysis under section 12 should focus on the totality of the relationship between the parent and the subsidiary. *Call Carl, Inc. v. BP Oil Co.*, 391 F.Supp. 367 (D.Md.1975), *aff'd in relevant part*, 554 F.2d 623 (4th Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977). The court can find that a parent corporation transacts business in the same district as its subsidiary only when the parent exercises dominion and control over the subsidiary as demonstrated by its continual supervision of and intervention in the subsidiary's affairs. *Scophony*, 333 U.S. at 814, 68 S.Ct. at 864; *Tiger Trash v. Browning-Ferris Industries, Inc.*, 560 F.2d 818 (7th Cir.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978).

The evidence submitted by Omega demonstrates that Citicorp had the controlling hand in the creation and initial structuring of Advance, CAC and CHI. Citicorp provided huge amounts of capital, contributed management advice, and was largely responsible for dictating the future dimension and scope of its mortgage finance subsidiaries. There is no proof, however, of Citicorp's role subsequent to its creating and launching of the defendant subsidiaries.

The affidavit submitted by Carl Tibbets, Omega's former counsel, is nothing but a synopsis and subjective interpretation of the other evidence before the court—Citicorp's Federal Reserve disclosures and the Federal Reserve Opinions. This affidavit affirms the facts that Citicorp was responsible for plotting the initial direction and providing the start-up resources for the subsidiaries. It does not prove Citicorp's intervention in or supervision of the subsidiaries' affairs. *See, Scophony, supra*, 333 U.S. at 814, 68 S.Ct. at 864. Conspicuously absent from plaintiff's evidence are any factors that traditionally have influenced courts in determining that antitrust jurisdiction exists over a parent corporation. Citicorp and its mortgage finance subsidiaries share no officers or directors. *See Call Carl, supra*, 391 F.Supp. at 367. Citicorp does not devote an office or employee to participating in the subsidiaries day-to-day affairs. *Tiger Trash, supra*, 560 F.2d at 818. At most, the evidence that Omega submits indicates a relationship between the companies that is totally consistent with parent/subsidiary status; it does not prove that Citicorp substantially controls the defendant subsidiaries. *King, supra*, 565 F.Supp. at 719 (D.Md.1983). The evidence is insufficient to prove that the court has jurisdiction pursuant to section 12 of the Clayton Act.

### b. Jurisdiction Under Virginia's Long Arm Statute

The plaintiff alternatively argues that the court may exercise jurisdiction over Citicorp by virtue of Virginia's Long Arm Statute.

Virginia's Long Arm Statute states that: A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:

1. Transacting any business in the Commonwealth;

2. Contracting to supply services or things in this Commonwealth;

3. Causing tortious injury in this Commonwealth by an act or omission outside of this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or denies substantial revenue from goods used or consumed or services rendered, in this Commonwealth.

*Va.Code* § 8.01–328.1A. A state court may exercise this kind of long-arm jurisdiction only if there also exist minimum contacts between the defendant and the forum

so that the exercise of jurisdiction does not exceed the parameters of constitutional guarantees of due process. *Medeco Security Locks, Inc. v. Fichet-Bauche,* 568 F.Supp. 405, 408 (W.D.Va.1983). A court's assertion of jurisdiction must not violate "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Specifically, "the defendant's conduct and connection with the forum state [must be] such that he should reasonably anticipate being haled into court there." *World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

Omega, must therefore satisfy two burdens to justify this courts' exercise of jurisdiction over Citicorp. First it must prove that Citicorp somehow meets one of the statutory requirements of section 8.01–328.1A. Second it must prove that the court's exercise of jurisdiction will not overstep the limits of due process. *Medeco, supra,* 568 F.Supp. at 405.

*A. The Statutory Scheme*

■ Standing alone, the mere existence of a parent-subsidiary relationship does not conclusively indicate that a parent is within a court's jurisdiction by way of the subsidiary's in-state activities. *Cannon Manufacturing Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925). For the court to exercise *in personam* jurisdiction over a defendant parent corporation, the plaintiff should show (1) that the subsidiary's activities in Virginia are sufficient to confer jurisdiction pursuant to section 8.01–328.1 and (2) that the relationship between the parent and its subsidiary is such that the subsidiary's actions can be imputed to the parent. *See A.H. Robins, Inc. v. Zoo-Techniques, S.A.R.L.,* 204 U.S. P.Q. (BNA) 387 (E.D.Va.1979). The plaintiff can fulfill the second requirement by proving either that the parent uses the subsidiary as its alter ego, *Copiers Typewriters Calculators, Inc. v. Toshiba Corp.,* 576 F.Supp. 312 (D.Md.1983), or that the subsidiary is the implied agent of the parent. *Kolbe, Inc. v. Chromodern Chair*

*Co., Inc.,* 211 Va. 736, 180 S.E.2d 664, 667 (1971).

There is no question that the defendant subsidiaries' activities are sufficient to confer long-arm jurisdiction pursuant to section 8.01–328.1. They maintain offices in Virginia, are incorporated in the state and conduct extensive business here. It is less clear, however, that Citicorp's relationship with its subsidiaries is such that their activities be imputed to Citicorp.

■ Generally, it is true that a court can impute the behavior of an instate subsidiary to an out-of-state parent corporation if the plaintiff proves that the defendant operates in state through an agent. *Va. Code* § 8.01–328.1A. It is also true that a court can assert jurisdiction over a parent corporation if the plaintiff's evidence demonstrates that the subsidiary is a fictitious shield erected by the parent to protect itself from liability. *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Man., Inc.,* 519 F.2d 634 (8th Cir.1975). The plaintiff directs the court to numerous decisions in which other courts have relied on these theories to ignore the technical separation between parent and subsidiary and have held the parent liable for the subsidiary's activities.

Contrary to Omega's argument, however, these cases do not support a rule that all subsidiaries either act as agents for their parents or are sham corporations designed to help the parent elude legal responsibilities. *Fisher v. First National Bank of Omaha,* 338 F.Supp. 525, 529 (S.D.Iowa 1972), *appeal dismissed,* 466 F.Supp. 511 (8th Cir.1972). The majority of the cases which Omega cites are either tort or breach of contract actions stemming from defective products manufactured by the parent and marketed by the in-state subsidiary. *See, e.g., Copiers v. Toshiba, supra,* 576 F.Supp. at 312 (breach of warranty); *Lasky v. Continental Products Corp.,* 569 F.Supp. 1225 (E.D.Penn.1983) (products liability); *Fieldcrest Mills, Inc. v. Mohasco Corp.,* 442 F.Supp. 424 (M.D.N.C. 1977) (breach of warranty). In the one case which plaintiff cites that does not in-

volve defective products, the court exercised jurisdiction over the parent corporation only because the evidence demonstrated that the subsidiary was an undercapitalized shell organized to shield the parent from the consequences of its fraudulent activities. *See Lakota, supra,* 519 F.2d at 634. Obviously, the decisions in these cases were informed by the courts' unwillingness to let the producers of defective goods avoid liability by placing a middleman subsidiary between them and the ultimate consumer or victim. *Shanks v. Westland Equipment and Parts Co.,* 668 F.2d 1165, 1167–68 (10th Cir.1982); *Toshiba,* 576 F.Supp. at 320–21.

■ The evidence that Omega has submitted does not indicate that Citicorp uses the defendant subsidiaries as its middleman for mortgage financing. The "product," mobile home mortgages, originates with the subsidiaries, not with Citicorp. Citicorp maintains no daily control over the daily sales or business decisions of the subsidiaries. It does not strictly control the product that the subsidiaries offer to the public. *See Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175, 1177 (9th Cir. 1980), *cert. denied,* 449 U.S. 1062, 101 S.Ct. 785, 66 L.Ed.2d 604 (1980).

It is true that Citicorp has not built an impregnable wall between itself and its subsidiaries. It supervised the creation of its subsidiaries, undertook to finance them and even contributed management skills and resources. This type of participation, however, is the minimum to be expected from any parent corporation that maintains subsidiaries as sources of revenue and profit. There is no evidence, however, that Citicorp controls the services that flow through its subsidiaries or that it maintains its subsidiaries solely to shield itself from legal liability. Its subsidiaries are not its agents and their actions should not be imputed to Citicorp.

Having found that Omega has failed to prove that Citicorp falls under the rules of § 8.01–328.1, it is unnecessary for the court to consider whether its exercise of jurisdiction would violate Citicorp's right to due process of law.

## II. Defendants' Motion to Dismiss Count VI

Count VI of the amended complaint accuses the defendants of participating in a product tying arrangement in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, Section 3 of the Clayton act, 15 U.S.C. § 14, and Section 106 of the Bank Holding Company Act, 12 U.S.C. § 1972. The defendants have moved to dismiss this count on the ground that Omega is without standing to sue the defendants for their alleged violations of these laws.

### a. Standing under the Antitrust Laws

■ "To bring a claim under the antitrust laws, a plaintiff must assert an 'injury in his business or property by reason of anything forbidden in the antitrust laws.' 15 U.S.C. § 15" *Barber & Ross Co. v. Lifetime Doors, Inc.,* 810 F.2d 1276, 1279 (4th Cir.1987). While this requirement is often referred to as antitrust standing, it should be noted that it is broader than constitutional standing and requires a plaintiff to prove more than simple injury in fact. *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983). Unquestionably, a consumer in a tied product market who is forced to purchase an unwanted product or unwanted supplies of a product is the victim of an antitrust injury with standing to sue. *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 12–13, n. 19, 104 S.Ct. 1551, 1558–1559, n. 19, 80 L.Ed.2d 2 (1984); *Fortner Enterprises v. U.S. Steel Corp.* (Fortner I) 394 U.S. 495, 498–99, 89 S.Ct. 1252, 1256–57, 22 L.Ed.2d 495 (1969); *Barber & Ross, supra,* at 1279. Similarly, when a defendant's tying scheme denies its competitors access to the market for the tied product, the competitors have suffered an injury remediable under the antitrust laws. *Northern Pac. Railroad Co. v. United States,* 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). But when a plaintiff is neither a clearcut consumer nor a direct competitor in the relevant market, the question whether a plaintiff may recover for alleged injuries

requires a court "to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated General, supra,* 459 U.S. at 535, 103 S.Ct. at 907.

Primarily the court must determine whether the plaintiff has alleged an injury of the type the antitrust laws were designed to prevent. *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 483, 102 S.Ct. 2540, 2550, 73 L.Ed.2d 149 (1982). Besides the nature of the plaintiff's injury, other factors relevant to an antitrust standing inquiry are: the tenuous and speculative character of the relationship between the alleged antitrust violation and Omega's alleged injury, "the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged" violation. *Associated General, supra,* 459 U.S. at 545, 103 S.Ct. at 912. Although a court should recognize Congress' expansive remedial purpose in enacting the antitrust laws, *Pfizer, Inc. v. India,* 434 U.S. 308, 313–14, 98 S.Ct. 584, 587–88, 54 L.Ed.2d 563 (1978), it must also observe that an overly permissive application of antitrust standing could undermine the strong interest in "keeping the scope of complex antitrust trials within judicially manageable limits." *Associated General, supra,* 459 U.S. at 543, 103 S.Ct. at 911.

*1. Type of Injury*

■ The antitrust laws assure that consumers will receive the benefits of price competition and protect the economic freedom of market participants. *United States v. Topco Associates, Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972). To determine whether a plaintiff's injury is of the type that Congress sought to redress through the antitrust laws, a court should examine whether there is a causal connection between the plaintiff's damages and the defendants' attempt to restrain competition in the relevant market. *See Blue Shield, supra,* 457 U.S. at 482, 102 S.Ct. at 2550; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488–89, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977). Thus, when a plaintiff alleges

a tying arrangement, the court should examine the connection between the anticompetitive tie and the forced purchase of unwanted products or services, *Barber & Ross supra,* at 1279, or the connection between the consumer's injury and its refusal to participate in a supplier's tying scheme. *Osborn v. Sinclair Refining Co.,* 324 F.2d 566, 571–73 (4th Cir.1963).

■ Omega alleges that the defendants illegally tied mobile home insurance to mobile home financing by forcing its mortgagors to accept insurance policies that they could have purchased elsewhere. These allegations do raise the possibility that the defendants' marketing scheme for mortgages and insurance injured the ultimate consumers of their mobile home loans. Further, it is possible that Omega lost insurance brokerage commissions as a result of the defendant's scheme. Yet, those lost commissions are not the kind of damages that the tying restrictions are supposed to prevent.

Omega was not forced to purchase unwanted supplies of mobile home insurance. Nor is Omega a consumer in the mobile home finance market who has somehow been injured by refusing to cooperate in the defendant's scheme. *Osborne,* 324 F.2d at 571–73. While it seems that the consumers of the defendants' mobile home mortgages are within the scope of the Sherman Act's intended scope, Omega, the broker of the defendants' services is not.

*2. The relationship between Omega's injury and the defendant's scheme*

Another circumstance that persuades the court that Omega has no antitrust standing is the tenuous and indirect relationship between the injury and the defendants' alleged anticompetitive behavior. *See Associated General,* 459 U.S. at 541–42, 103 S.Ct. 910.

A direct antitrust injury is one that is so integral an aspect of the alleged activity that there is no doubt but that the plaintiffs' loss was precisely "the type of loss that the claimed violations.... would be likely to cause." *Blue Shield, supra,* 457 U.S. at 479, 102 S.Ct. at 2548; *Brunswick, supra,* 429 U.S. at 489, 97 S.Ct. at 697.

Direct injuries encompass the lost revenue of the defendants' competitors in the same market in which trade is restrained, *see Exhibitors Service Inc. v. American Multi-Cinema,* 788 F.2d 574, 579 (9th Cir.1986), or the losses experienced by the consumers of the affected product or services. *Blue Shield, supra,* 457 at 484, 102 S.Ct. at 2551.

Here, Omega has not alleged a direct injury but a derivative one. In any business transaction commissions are a function of consumers' purchasing decisions and suppliers' marketing decisions—they rise and fall as a function of volume of transactions. Assuming that the defendants did intend to restrict competition among mobile home insurance providers, Omega's lost commissions are the indirect result of the modified economic strategies adopted by competing mobile home insurance providers or purchasers. More appropriately, a lawsuit against these defendants should concern the losses of those suppliers and customers, not of the middleman whose losses, if any, are separated from the defendants' actions by the complex marketing and purchasing decisions of the actual participants in the relevant market.

### 3. Duplicative Recovery or Complex Damages

The sources of courts' reluctance to entertain the claims of indirectly damaged parties are a concern that the assessment of a precise amount of damages could be extraordinarily complex and that granting relief to a middleman could trigger a storm of litigation as every participant in the chain of commerce would try to claim some portion of the damages. *Associated General, supra,* 459 U.S. at 544, 103 S.Ct. at 911.

To adequately adjudicate Omega's claim for lost brokerage fees, it would be necessary for the court to determine to what extent the losses of insurance providers were passed on to Omega. In turn, it would be necessary to ascertain the extent to which the affected consumers altered their mobile home financing decisions. Such an inquiry would be technical and highly complex but ultimately irrelevant to

enforcing the goals of the antitrust laws to promote competition and to protect consumers. *Topco, supra,* 405 U.S. at 610, 92 S.Ct. at 1134. No decision rendered in favor of Omega would vindicate the antitrust interests really implicated by the defendants' actions—those of consumers and providers in the mobile home insurance market.

### 4. More Appropriate Parties

An action brought by the defendants' consumers or direct competitors would encounter none of the previously discussed difficulties that encumber Omega's claim. Were there no other party but Omega to bring the defendants' action to light, an antitrust suit on its behalf might be appropriate. However, "[t]he existence of an identifiable class of persons whose self interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party," such as Omega, "to perform the office of a private attorney general." *Associated General, supra,* 459 U.S. at 541, 103 S.Ct. at 910. The defendants' actual competitors or consumers could allege direct injury, they would eliminate complex calculations to approximate damages, and they would deter a flurry of further litigation by additional parties claiming attentuated and remote injuries. Omega's suit potentially would restore its claimed losses, but it would pose the problem of duplicitous and complex litigation. Further, it would do nothing to protect competition or consumers in the market for mobile home mortgages—the real antitrust interests a stake here.

The circumstances of this case, evaluated in light of the elements of antitrust standing enunciated by the Supreme Court, indicate that Omega is not a proper party to enforce the antitrust antitying provisions against these defendants. Accordingly, the court will dismiss the antitrust claims in Count VI.

### b. Standing Under the Bank Holding Company Act

In addition to the tying charge under the antitrust laws, Count VI also charges that

the defendants violated the antitying provisions of the Bank Holding Company Act. 12 U.S.C. § 1972 ("BHCA"). The defendants contend, however, that Omega has no standing to sue for BHCA tying violations.

The provisions of the BHCA are analogous in purpose to the provisions of the antitrust laws. *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 46, 100 S.Ct. 2009, 2020, 64 L.Ed.2d 702 (1980); *Parsons Steel v. First Alabama Bank of Montgomery,* 679 F.2d 242, 245 (11th Cir.1982). As its underlying objective for the BHCA, Congress intended to curtail anticompetitive tendencies in the national credit market. *Lewis, supra,* 447 U.S. at 46, 100 S.Ct. at 2020. Thus, when courts have attempted to resolve questions of standing under the BHCA, they have relied on the same analysis that they use to determine antitrust standing. *Campbell v. Wells Fargo Bank, N.A.,* 781 F.2d 440, 443 (5th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). The same considerations of direct injury, the potential for complex and duplicative recovery and the availability of more appropriate plaintiffs that comprise the antitrust standing analysis also make up the BHCA standing analysis. *Walker v. U–Haul of Mississippi,* 747 F.2d 1011, 1014 (5th Cir.1984). *See also, Associated General, supra,* 459 U.S. 519, 103 S.Ct. 897.

■ The court will deny Omega standing to sue under the BHCA antitying provisions for the same reasons that it has denied it standing under the antitrust tying prohibitions. Plaintiff argues that an allegation of injury is sufficient for BHCA standing. While this statement may be true when a plaintiff alleges that it is a customer of the defendant banking institution, *Swerdloff v. Miami Nat. Bank,* 584 F.2d 54 (5th Cir.1978), the court is not persuaded that a middleman who alleges injury automatically has BHCA standing.

Because the court finds that Omega has no standing under the BHCA or the antitrust laws, it will dismiss the remainder of Count VI of plaintiff's amended complaint.

### III. Plaintiff's Motion to Modify the Stipulated Protective Order

The final issue now before the court is whether to modify the stipulated protective order which until now has limited the plaintiffs' ability to use certain discovery materials for purposes other than this lawsuit. Omega seeks to modify the protective order so it can share discovered information with plaintiffs in five other federal suits against CAC. CAC counters that it will suffer unfairly if the court modifies the protective order because Omega would be free to disseminate certain confidential information that the defendants originally disclosed in reliance on the terms of the original order.

■ Generally, when a party obtains information through discovery the fruits of that inquiry should be available to the public. *American Tel. & Tel. Co. v. Grady,* 594 F.2d 594, 596 (7th Cir.1978), *cert. denied, sub. nom. American Tel. & Tel. Co. v. MCI,* 440 U.S. 791, 99 S.Ct. 1533, 59 L.Ed.2d 787 (1979). To protect parties from harm that may result from unfettered exposure of discovered information, Rule 26 of the Federal Rules of Civil Procedure grants courts the discretion to enter protective orders to limit the scope of discovery or to curtail the disclosure of certain discovered material. *F.R.Civ.P.* 26(c). Courts further enjoy the discretion to lift or modify protective orders in light of changed circumstances that eliminate a continued need for protection. *Krause v. Rhodes,* 671 F.2d 212, 219 (6th Cir.), *cert. denied sub nom., Attorney General of Ohio v. Krause,* 459 U.S. 823, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982); See also *Nixon v. Warner Communications,* 435 U.S. 589, 599, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978); *In Re Agent Orange Product Liability Litigation,* 104 F.R.D. 559, 568 (E.D. N.Y.1985).

In considering motions to modify protective orders, courts are split as to whether the burden of showing good cause for continued protection lies with the protected party or with the party seeking modification. *Compare, e.g., In Re Coordinated Pretrial Proceedings in Petroleum Prod-*

**404**

*ucts Antitrust Litigation,* 101 F.R.D. 34, 44 (C.D.Cal.1984); *with Federal Deposit Insurance Corp. v. Ernst & Ernst,* 677 F.2d 230, 232 (2d Cir.1982). When, however, the proposed modification affects a protective order stipulated to by the parties, as opposed to one imposed by the court, it is clear that the shared and explicit assumption that discovery was for the purposes of one case alone goes a long way toward denying the movant's request without more. *GAF Corp. v. Eastman Kodak Co,* 415 F.Supp. 129 (S.D.N.Y.1976); *see also, Grady, supra,* 594 F.2d at 597.

 Omega's recent idea of sharing discovery with litigants in other cases must be judged by the court with the understanding that this was never a proposed or expressly anticipated step when CAC disclosed information to Omega in the first place. *See GAF, supra,* 415 F.Supp. 132. Omega argues that the parties with whom it seeks to share discovery will save considerable time and expense if the court grants them access to the discovery in this case. It also assures the court that it will refrain from turning over any of CAC's confidential business information to those other parties. The court finds neither of these arguments compelling enough to justify abrogating the order previously agreed to. Omega and CAC fairly agreed to the protective order, apparently through negotiations by their sophisticated and well informed counsel. Throughout discovery CAC relied on that mutual understanding that the information it was disclosing was to be used solely for preparing this case. In effect, Omega is asking the court to rewrite the terms of the stipulated order and to apply them retroactively. The court refuses to endorse Omega's tactic of inducing broad disclosure under a set of ground rules and of then avoiding any limitations on itself by asking the court to come in and change those rules. Omega's motion to modify the stipulated protective order will be denied.

An order consistent with this opinion will be entered on this day.

* Pursuant to Federal Rule of Civil Procedure 25(d), Robert L. Clarke has been substituted as a party defendant.

**ORDER**

For the reasons stated in the accompanying Memorandum Opinion it is hereby

**ORDERED**

1) that Citicorp be dismissed as a defendant in this case for lack of *in personam* jurisdiction;

2) that count VI of the amended complaint be dismissed; and

3) that plaintiff's Motion to Modify the Stipulated Protective Order be DENIED.